Nathaniel T. Helman, J.
The action is brought by First Natipnal City Bank (Citibank) as the issuer of'certain travelers’ checks, against American Broadcasting Company, Inc. (ABC), as a selling agent for the face value of the checks, together with commissions. The checks were issued in blank, signed by plaintiff, with authority to sell the checks, retain a portion of the commission, and remit the balance to plaintiff. Sometime in December, 1967 numerous checks were presented to Citibank and paid, although no funds had been remitted to the bank for their sale. Investigation revealed that some $29,000 worth of the $40,000 in checks originally delivered had disappeared under mysterious circumstances. The bank having demanded payment, ABC denied responsibility, and this action ensued.
While the pleadings as originally drawn presented plaintiff’s claim as one founded on contract, motions to conform the pleadings to the proof were granted, and the right of plaintiff to regard defendant’s conduct as tortious in view of its status as bailee was given consideration. The form of trust receipt used by the bank contains no affirmative undertaking by the selling agent other than to retain the checks in custody, account for their distribution and remit when sold. Where trust receipts contain special covenants obligating the selling agent to assume respon *863 sibility for lost or stolen checks, irrespective of negligence, he becomes an insurer and is contractually liable. On the other hand, where the obligation is merely to retain custody and to notify in case of loss or theft, the issuer cannot shift the risk of loss to the selling agent, where the latter has not been proved negligent (Mellon Nat. Bank v. Citizens Bank & Trust Co., 88 F. 2d 128).
Because issuers of travelers’ checks have consistently pursued a policy of promoting salability, even at the cost of sustaining losses in doubtful cases, there is very little decisional law on the legal characteristics of the traveler’s check, and it is somewhat of a legal anomaly. Its convenience, ready negotiability, and the facility for cashing by merchants and bankers throughout the world render it vulnerable to counterfeit and larceny with limited opportunity for investigation. Generally speaking, delivery to a selling agent creates the relationship of bailor and bailee, with the customary obligation by the bailee to exercise ordinary care in his protection of the bailed goods (Davis v. Lampert Agency, 30 A D 2d 299; 5 N. Y. Jur., Bailment, § 65, p. 75). The general rule is that if the bailor proves demand and failure to deliver, these facts are sufficient to establish negligence prima facie; on a showing by defendant that the goods have been lost by theft, plaintiff must demonstrate that the loss was occasioned by defendant’s negligence (Castorina v. Rosen, 290 N. Y. 445; J. W. Mays, Inc. v. Hertz Corp., 15 A D 2d 105, 110). A mere allegation of theft, however, or of a mysterious disappearance, is not of itself sufficient to excuse the failure to return (Dalton v. Hamilton Hotel Operating Co., 242 N. Y. 481; Procter & Gamble Distr. Co. v. Lawrence Amer. Field Warehousing Corp., 16 N Y 2d 344).
At the time of the delivery of the checks to ABC, representatives of the bank, both orally and in their written “ issuance instructions,” made clear that the checks were to be guarded like cash, and kept in a burglarproof enclosure. ABC retained the checks for close to one and one-half years without issuing a single one, its explanation being that the company was making a transition from its association with a former dealer. Nevertheless, the checks were left in an unlocked safe drawer occasionally inventoried, but otherwise readily available to the employees within the immediate area of the safe. The last detailed inventory was taken some six months prior to the discovery of the loss, thus rendering it possible to have the checks appropriated piecemeal without exposure. Inquiry by the court as to why the drawer was not locked was met by the response that keeping the drawer open during the day would avoid suspicion by *864 persons within the area as to what a locked drawer might contain. Concededly, the safe was not broken into at night, there being no visible marks of entry, and the accepted inference was that an employee of ABC, during the day, appropriated the checks. Obviously, defendant did not employ reasonable care in the control and custody of this property considering that the blank checks were the equivalent of cash; the safeguards used in guarding them for one and one-half years can hardly be classified as prudent. Plaintiff is therefore entitled to a finding that defendant was neglient and to a judgment for the amount paid by the bank up to the date when it was informed of the larceny.
A more troublesome question is raised with respect to those checks paid after the discovery by the bank that they constituted part of the stolen property. It appears that on December 19 the bank’s representative called at ABC’s office to investigate the matter of missing travelers’ checks and following a conference, received a communication dated December 20 setting forth a list of the missing checks. On that very day, December 20, the bank cashed checks totaling $3,750; and defendant contends that payment of these should have been stopped' so as to avoid further loss to defendant.
Only one case in New York has touched the subject, and that decision appears to be in conflict with views expressed in other States, as well as with the provisions of the Uniform Commercial Code. In First Nat. City Bank v. Frederics-Helton Travel Serv. (29 Misc 2d 1041) the court held that a transfer of travelers’ checks from the issuer to a selling agent was not a “ delivery ” within the meaning of the Negotiable Instruments Law. The court held that the checks were incomplete in the hands of the selling agent because they did not contain the signature and countersignature of the purchaser, thus relieving the issuer of responsibility. An opposite view was expressed in American Express Co. v. Anadarko Bank (179 Okla. 606, 608), which held that the instrument was not incomplete in the hands of the selling agent because nothing remained to be done either by issuer or selling agent. Said the court, ‘1 If the cheques are to take the place of money and pass current as money, they should be subjected to the same rules and immunities which rest upon money under like circumstances.”
The Uniform Commercial Code would appear to have adopted the reasoning of the Anadarko case, for sections 3-115 and 3-407 in effect reverse section 15 of the Negotiable Instruments Law. It is now provided that nondelivery of an incomplete instrument creates only a personal defense which may be cut off by a holder in due course. Under these provisions, the issuing bank would *865 have to pay a check stolen in blank from the selling agent, thereafter signed and countersigned and sold to a holder in due course. Subdivision (3) of section 3-407 states, “A subsequent holder in due course may in all cases enforce the instrument according to its original tenor, and when an incomplete instrument has been completed, he may enforce it as completed.'’’ The bank would therefore have a right to pay any check presented by a holder in due course, signed and countersigned, irrespective of its knowledge that the check, in the first instance, was stolen. Checks of this type, known for their marketability, can be cashed in consumer stores and by business firms, banks, and individuals. Absent an obvious defect on its face, or a showing of bad faith, the bank must pay such instrument when presented by a presumptive holder in due course — that is, anyone who has delivered a consideration for it. Were it otherwise, the check would lose its value as a substitute for cash. Plaintiff is therefore entitled to a favorable judgment with respect to the checks paid on December 20, amounting to $3,750.
There remains the question of those checks which have not been held by holders in due .course, but which are presented in the first instance to Citibanklwith only one payee signature, the countersignature to be inserted at a branch of Citibank. Request has been made for a declarapry judgment with respect to such outstanding checks, as well as those which have been paid under such circumstances. It seems to me that the bank, in the interest of minimizing damages, has a responsibility, upon notice of the infirmity, to take reasonable precaution at its own branches to prevent the cashing of this class of checks. Before accepting countersignature, even if similar in appearance to the purported signature of the holder, payment should be stopped and the holder relegated to his proof of holder in due course status. Although the bank has some 175 branches, the interests of justice and the bank’s duty to minimize its damages require that each such branch be notified within a reasonable time that upon presentation by a third person claiming to be a payee of such check of an instrument incomplete because of lack of a countersignature, that such payment be stopped. To the extent that any such checks remain outstanding, as well as with respect to any that have been paid under such circumstances, defendant is entitled to the benefit of a declaratory judgment.
Accordingly, plaintiff may have judgment for the sum of $27,850, together with interest, and a declaratory judgment may be entered with respect to the rights of the defendant in accordance with the foregoing.