OPINION OF THE COURT
Joseph G. Golia, J.
This is an action brought by the plaintiff as a result of a teller’s check which was allegedly issued by defendant, Greater New York Savings Bank, and deposited with defendant, Chase Manhattan Bank, and which subsequently was dishonored by both defendants.
The matter has previously been tried by another court on stipulated facts which, in substance, set forth the following:
On April 3, 1979, plaintiff sold his car to a third person who is not a party to the action. In payment, plaintiff received the subject teller’s check drawn on Greater New York Savings Bank in the amount of $4,300. This teller’s check was previously discovered missing approximately eight years prior to its negotiation.
On April 4, 1979, plaintiff deposited the check into his account at Chase Manhattan Bank. Plaintiff’s account was credited in the amount of $4,300 on the following day. One *841 week later, on April 12, 1979, Chase debited plaintiff’s account in the amount of $4,301.50 (the $1.50 being the check return charge) because the check had been returned to Chase marked “payment stopped”.
The trial court dismissed the action against defendant Chase Manhattan Bank and further found that an issue of fact exists as to whether or not the remaining defendant was negligent.
The provision of law applicable to the case herein, section 3-406 of the Uniform Commercial Code provides, “Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course”.
At issue here, then, is the precautions, if any, taken by the defendant bank and whether such precautions were sufficient to protect a holder in due course from loss.
The instant nonjury trial was conducted on that sole issue of negligence.
Edward O’Connor, a bank employee for .20 years, was the only witness at trial. Mr. O’Connor, an assistant to the officer at the branch in question on the date the check was missing, did not have any independent recollection of that event. He nevertheless was able to testify as to the general procedures and precautions employed under like circumstances.
Generally, blank check forms were received from the printer in cartons accompanied by packing slips. The blank checks are not physically counted. There is, usually, a cursory inventory taken by comparing the packing slips with the cartoned items. We do not know if this was actually done at the time in question. On occasion, the printer will include a list of check numbers for those checks which were not printed. The instant check was not contained on such a list.
The cartons are then placed into the bank’s vault and removed by the head teller in pads of 50 checks. The teller then compares the first number of the “new” pad with the last number of the “old” pad to make sure they are in *842 sequential order. The pads, however, are not examined for all the checks contained therein when removed from the vault. The blank check pad is then placed on a check-writing table located behind the teller’s windows.
All bank and security personnel have access to the check-writing table. This is equally true for maintenance crews when accompanied by bank employees. At the conclusion of the banking day, if a blank teller’s check is discovered missing, a general search is made of the teller’s area including the trash bins. The day’s activities are then reviewed in an effort to find the missing check or establish the reason for its loss. If the above procedures prove fruitless, the only action taken by the bank was to issue a “stop payment” order and maintain that order on the books in perpetuity.
The defendant bank, at no time, took action of any kind by way of informing or notifying the public of the missing check’s lack of authenticity.
Mr. O’Connor testified that it was not uncommon for blank teller’s checks to be missing; indeed, the check in question was one of a series discovered missing that day (another one of these checks was in fact negotiated and dishonored). Mr. O’Connor further indicated that one of the signatures on the check in question was in the name of an authorized signatory.
In order for the plaintiff to prevail herein, there are two important questions which must be answered in the affirmative, specifically:
(1) Is the plaintiff a holder in due course; and
(2) Did the defendant, by its negligence, substantially contribute to the making of an unauthorized signature?
The first issue having previously been disposed of by the prior court finds the plaintiff to be a holder in due course. That issue having been decided in favor of the plaintiff, the court now turns its attention to the second issue.
The second issue, being more problematic, requires a closer examination of general banking practices in conjunction with the facts of the instant case.
This court is constrained by the law of the case, and therefore may not consider the doctrine of res ipsa loquitur. *843 However, had the previous court been apprised of all the facts now before this court, that issue may well have remained for this court to decide.
Accordingly, this court must now determine what constitutes the basic duty of care required of defendant bank and whether or not the bank breached that duty.
It is axiomatic that the risk reasonably to be perceived defines the duty to be obeyed.
Ordinarily, determination of negligence and foreseeability are gauged by the “reasonable man” standard. However, because of the implicit dependence and the bond of trust and responsibility inherent in the relationship between a bank and the public, this relationship demands a higher degree of responsibility and a narrower margin of error.
In our system of free-flowing commerce in which banking institutions play an essential and lucrative role, it is necessary that our citizens be able to maintain an unshaken trust in these universally recognized protectors of fiscal stability.
Should the perception that the citizen must be on his guard to look behind the face of a bank draft become commonplace, the inevitable result will be that commerce will be impeded as additional guarantees on bank checks are increasingly demanded. Banks must therefore be held accountable for failing to take sensible precautions to prevent a holder in due course from falling prey to the receipt of an apparently valid bank check which is in fact a forged instrument.
This bank’s failure to take any precautions other than the self-protecting expedient of a stop payment order, substantially contributed to the making of the instant unauthorized bank check.
Had the defendant bank in the instant matter taken some precautions, such as: printing the following legend on all bank checks: “This check is not valid unless embossed with the bank’s seal over the authorized signatures”; publishing and disseminating to other banks a list of all missing bank checks; dating the check for staleness; maintaining stricter security in and around the check-writing *844 table; and conducting a more complete inventory of blank bank check forms that are received from the printer, then the court might be disposed to find otherwise.
The requirements would be substantially different in the case of a personal check. Unlike the acceptor of a bank check, one who accepts a personal check is generally aware of all the insecurity that accompanies a business transaction between individuals. Individuals understand the risks involved in personal transactions, and the limited legal redress available to the unwary in those transactions. We thus could not hold a bank liable for a personal check made in excess of the funds on deposit or drawn by someone other than the depositor. The latter example is easily avoided by the acceptor satisfying himself as to the identity of the offeror, a solution of no value to the acceptor of a forged bank check.
In the instant case, the defendant bank, whose bank checks would be accepted without question in the ordinary course of business, failed to adopt any procedures for protecting the public from being misled by a bank draft which had been missing and subsequently forged. That fact, along with the bank’s faulty security practices, has allowed such a draft to enter and remain unimpeached in the stream of commerce. It was therefore foreseeable that such a draft would come into the hands of the plaintiff in the ordinary course of events on which banking and commerce rely, and that the plaintiff would accept same for value without notice of any defects, and would, thereby, suffer a loss as a result.
The court does not here hold the bank strictly liable for all stolen checks. Such a holding, which would arbitrarily penalize the banking industry, creates the very sort of unnatural restraint on commerce which this court is trying to prevent. However, when a bank fails, as is the case herein, to take the necessary precautions to safeguard the public from stolen bank drafts which by their very status are cash equivalents (see Savemart, Inc. v Bowery Sav. Bank, 111 Misc 2d 1071, affd 117 Misc 2d 947), then it must be held accountable.
The defendant bank strenuously argues that it could not have perceived the loss suffered by the holder in due *845 course. This argument, however, is belied by the bank’s action in placing and maintaining a “stop payment” order on this check for the substantial period of time involved. It is apparent to this court that the bank foresaw the possibility, if not the likelihood, of the check entering the stream of commerce. It thereupon took actions to protect itself while admittedly taking no action to protect a person relying on the validity of this instrument.
The defendant asserts that it complied with its customary procedures and that nothing further could have been done to protect a holder in due course.
However, what “ ‘usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable pruden ce, whether it usually is complied with or not.’ ” (Alibrandi v Helmsley, 63 Misc 2d 997, 998.)
It is apparent in the instant matter that what ought to have been done is substantially more than what was done herein.
The court finds that the bank failed to fulfill that standard of care required under the circumstances and that such failure substantially contributed to the making of the unauthorized signature.
Accordingly, the court finds judgment in favor of the plaintiff in the sum of $4,301.50.
The court takes special note in thanking counsel for the respective parties for their informative and artfully drawn briefs.