Nicolaos XANTHOPOULOS, Plaintiff,

v.

THOMAS COOK, INC., Defendant.

No. 83 Civ. 4878 (LBS).

United States District Court, S.D. New York.

Nov. 25, 1985.

Daniel Elliot Laitman, P.C., New York City, for plaintiff; Simon C. Dimas, Neal Johnston, of counsel.

Battle, Fowler, Jaffin & Kheel, New York City, for defendant; Gerald J. Fields, Raymond J. Soffientini, Leslie J. Granite, of counsel.

### OPINION AND ORDER

SAND, District Judge.

With a background of foreign intrigue and mystery more reminiscent of "The Maltese Falcon" than of a classic bills and notes dispute, plaintiff seeks to collect from defendant $150,000 and damages resulting from Cook's dishonoring 150 $1,000 travelers checks which Cook claims were stolen and bear forged countersignatures. The case has been tried to the Court and the following constitutes our findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).

### FACTS

Plaintiff claims that his travelers checks were, in fact, countersigned by the proper party and that he is the holder in due course of valid negotiable instruments. Alternatively plaintiff contends that if forged, the forgery is "latent," *i.e.*, not readily discernible to the average person, and thus, for various reasons, Cook is obligated to honor the travelers checks taken in good faith by plaintiff. Finally, plaintiff contends that in its investigation of the claim by the original purchaser, the checks had been lost or stolen and in its failure to adequately alert banks and agencies in Greece to the fact that these checks were on a lost or stolen list, Cook was negligent and caused plaintiff to suffer compensable injuries. To deal with these issues we must trace the history of the checks in question:

### I. *Majid Barghouthi's Purchase of the Checks*

The parties have stipulated (Pre-Trial Order ¶ 3(a)(1), hereinafter "PTO") that on August 12, 1982 a person holding a Saudi Arabian passport showing the transliterated name "Majid Barghouthi" bought 150 U.S. $1,000 Thomas Cook Travelers Checks from Bank Indosuez in London, England.

The manager of the bank branch who sold the checks to Barghouthi, Ramez Maatouk, testified that it was not unusual for mid-eastern customers to buy travelers checks in $1,000 denominations. He testified that he knew Barghouthi, held accounts for his brother and father, and that Barghouthi signed the checks in his presence. He further testified that Barghouthi had an account at that bank for some six to seven months before he bought the checks and still maintains a modest ($25,000) account there.

On August 13, 1982, Barghouthi reported that the checks had been lost or stolen at Heathrow Airport in London and made a claim for a refund. Barghouthi spoke to the office manager of its branch of Bank Indosuez, who in turn called Cook. A Mr. Charles of Cook called Maatouk and he confirmed Barghouthi's integrity and good standing at the bank. Barghouthi completed a refund application at the bank's office, which application was forwarded to Cook. Maatouk received a telephone call from Mr. Charles advising that the checks could be replaced and he, together with Barghouthi, went to Cook's office where Barghouthi signed a new sales advance receipt and 150 $1,000 replacement checks.

The tale now shifts to plaintiff and to Athens, Greece.

### II. *Plaintiff Buys the Checks*

Plaintiff, Nicolaos Xanthopoulos, is a graduate architect with a degree in urban planning who maintains a planning office and acts as a consultant on urban planning. In 1980 his father died and plaintiff continued his father's business affairs which were those of a broker in stocks, precious metals and foreign currencies. Neither plaintiff nor his father was licensed to engage in such transactions but such dealings were common in Greece where inflation and other economic conditions led many Greeks to seek to protect the value of their money.

### A. *Plaintiff's Version of How He Acquired the Checks*

In July, 1982 plaintiff received a telephone call asking for his father by nickname. Plaintiff advised the caller, who identified himself as Majid Barghouthi, that his father had passed away but that he had continued his father's business.

A month later the same party again telephoned and said he was coming from Cypress, Greece. A meeting was arranged at the caller's hotel, the Hotel Meridien (a well-known luxury hotel much frequented by foreign tourists). Xanthopoulos met with the caller, who spoke of plaintiff's father and appeared familiar with the details of plaintiff's family. The caller (who for convenience we will refer to as "Barghouthi II") said that his parents lived in Beirut and intended to come to Greece and buy some property which would be converted into a hotel. Barghouthi II inquired if plaintiff would be interested in doing the design work for the conversion, an opportunity which plaintiff would have seized with relish. The parties conversed in English and Barghouthi II wore western garb.

Barghouthi II then stated that he had $150,000 in travelers checks and that it would take 15 days to cash the checks at a bank. Barghouthi II said that he needed the cash because he would be going to contract and asked plaintiff if he would cash the checks. Plaintiff testified that he expressed reluctance at first, whereupon Barghouthi II said that if plaintiff was worried he would give him the serial numbers of the checks and only after plaintiff checked the numbers would they do the deal. Plaintiff did not then see the checks and learned they were Cook's checks only when he was given the numbers. He asked for and was shown Barghouthi II's Syrian passport which of course included a photograph resembling Barghouthi II. Nothing was said at the meeting about a commission to plaintiff.

### B. *Plaintiff's Pre-Purchase Investigation*

Plaintiff testified that as he left the Hotel Meridien he went to the hotel register and verified from the registration form

that a Majid Barghouthi with a Syrian passport had registered.

Then he went across the road to the next block, which he believed contained a Thomas Cook agency. At the time the office (now in fact a Cook agency) was a branch of La Compagnie Internationale des Wagon Lits et de Tourisme, a travel company with which Cook maintains close relations and which acted as a sales agent for Cook in Greece. The parties have stipulated that "Thomas Cook has no knowledge of any instructions that were ever given to these selling agents in Greece [Wagon Lits, National Bank of Greece and the Ionian and Popular Bank of Greece] as to how to respond when inquiry is made whether certain Thomas Cook travelers checks had been reported to Thomas Cook to have been lost or stolen" (PTO at ¶ 10).

Plaintiff, observing the sign on the door reading "Associated with Thomas Cook" and believing himself to be at an authorized Cook agency, went to a cashier's window and asked whether the checks with the numbers on his list had been reported lost or stolen. He was told that the office did not keep a list of that sort and that he could go to the Tourist Police (Alien's Bureau) or the Bank of Greece. He was not given any other place or number to contact.

Plaintiff went to the National Bank of Greece where he made the same inquiry, waited an hour and was told that the numbers were not on any list in the bank's possession. He also went to the Ionian Bank where he was told that it would take 15 days for a reply.

Plaintiff also made some inquiries by telephone of family friends to see if they had heard of Barghouthi.

The parties have stipulated that "Thomas Cook did not circulate the serial numbers of the travelers checks to banks in Greece nor to any of its selling agents in Greece." PTO at ¶ 9.

Two Cook witnesses, Nigel Mercy and William Ferris, testified as to Cook's procedures with respect to notification of lost and stolen checks. Mercy, an employee of Cook in England testified that prime responsibility for investigation and security of checks payable in United States currency rests with the American office by which Ferris is employed. Mercy testified that the American office asked that notification be given to those places where they thought the checks might be cashed. Thus, banks at Heathrow, which are open 24 hours a day, are notified by telephone as well as some 20 London Bureaux D'Exchange (also open 24 hours a day). A circular telex is sent to European banks in countries that agreed to assist and confirmatory stop lists are also sent to such banks.[1] Thus, stop lists were sent to certain countries but Cook has been unable to locate a list containing the numbers in question, allegedly because such lists are not permanently retained. To some countries lists are sent only of stolen *blanks*, *i.e.*, those checks not signed by the purchaser.

Consistent with the stipulation noted above Mercy testified that no notification was sent to any banks or banking associations in Greece because: 1) past experience was that Greece was not a problem area, and 2) there was no proper agreement with any Greek banking association to receive such lists.

Mercy also testified that no stop lists were sent to sales and refund agencies (such as Wagon Lits) unless they had asked for such lists or had cashed stolen checks in the past.

Cook began to send notices to Greece, Mercy testified, only after it opened its office in that country some two-and-one-half years ago.

Despite this practice of Cook, it appears that Cook stop lists were in fact available in Greece. Plaintiff's witness Ioannis Avradinis testified that in 1982 he worked for National Bank of Greece in Piraeus (a suburb of Athens) and that the bank then

---

**1.** In some countries banks agree to accept such lists only on Cook's undertaking that it will not refuse to honor checks on the list solely because they appear on such list.

received stop lists for stolen Cook checks. he did not know if such lists came from Cook itself but the lists described the numbers and quantities of checks. It is not clear if these were stolen blanks or bore the purchaser's signature.

### C. *Xanthopoulos Purchases the Checks*

Plaintiff testified that he had a client George Tambakis (also called as plaintiff's witness) who was a Greek publisher who had expressed a desire to acquire United States currency. After conducting the foregoing investigations, plaintiff telephoned Tambakis who agreed to purchase $150,000 U.S. from him. Tambakis testified that he did not know that he was purchasing travelers checks rather than currency; that a price was agreed upon and that the next day he withdrew Greek drachmas from his account and had them delivered by messenger to plaintiff.

Plaintiff was called by Barghouthi II at his home that evening and told Barghouthi II that he was willing to buy the checks but only at the official bank rate, no more, no less. Barghouthi II agreed. The official bank rate was somewhat more advantageous to the buyer than the rate at which United States currency traded in the unofficial market.

At 10:30 the next morning, accompanied by his brother, plaintiff went to Barghouthi II's room at the Hotel Meridien with the 10,500,000 drachmas which had been delivered to him that morning by Tambakis. Barghouthi II took the checks from a suitcase, some in booklet form, others not, and in the presence of plaintiff and his brother countersigned the 150 checks. The signing took ten to twelve minutes. Barghouthi II handed the checks to plaintiff who examined the signatures, counted the checks and asked Barghouthi II for his passport. Barghouthi II said that plaintiff had already seen his passport and showed him instead a driver's license which contained a photograph and signature. Barghouthi II and

plaintiff agreed to have a drink and dinner that evening and Barghouthi II gratuitously gave plaintiff a 40,000 drachmas commission (about $400). Barghouthi II later cancelled the dinner engagement and plaintiff had no further contact with him.[2]

Barghouthi II had told plaintiff that he had another $150,000 in checks but plaintiff said that he did not wish to talk about those until the first $150,000 cleared. Plaintiff did not ask Barghouthi II how he had obtained the second $150,000 and of course the first checks never cleared the bank.

### III. *The Checks are Dishonored*

Tambakis had instructed plaintiff to deposit the $150,000 (which he believed to be in currency) to a numbered account at a bank in Geneva, Switzerland. Plaintiff's brother, who is an economist living in Germany, took the checks to the bank in Geneva and deposited them to the account number supplied by Tambakis (which Tambakis testified was his account). Some ten to fifteen days later Tambakis called and said that the checks were dishonored. Plaintiff alleges that he paid back Tambakis, borrowing funds for this purpose from friends to whom he gave notes received in evidence. His arrangements with Tambakis were entirely oral as is customary in such transactions.

### CONCLUSIONS

### I. *The Checks Were Forged*

Both parties have called expert handwriting analysts who of course reach opposing conclusions as to the authenticity of the Arabic signatures appearing on the 150 travelers checks. There are many exemplars for their analysis: 600 signatures, two each on the 150 original and 150 replacement checks; passport; sales advice; refund applications, etc. Plaintiff's expert concluded that all 600 signatures were written by the same person, but he also opined that "the questioned signatures re-

---

**2.** Plaintiff instituted criminal proceedings in Greece against Barghouthi II who was tried, convicted and sentenced in absentia.

veal what appears to be a willful attempt at disguising or modifying certain characteristics, presumably in an effort to support an otherwise unmeritorious claim of forgery." Letter of Andrew Sulner, Plaintiff's Exhibit 32, p. 1.

It is plaintiff's theory that what has occurred here is a scam perpetuated on Cook and on plaintiff by a single person, Majid Barghouthi, who could not be located by either party prior to trial. To carry out this scam, he falsely reported the checks as having been stolen and then negotiated them to plaintiff. In order, however, to substantiate a later claim that the checks bore a forged countersignature, he deliberately disguised certain characteristics of his signature, making the signature similar enough to his own so as to fool Xanthopoulos but different enough so that a claim of forgery could later be sustained. In support of this claim, plaintiff's expert, Andrew Sulner, stresses that the two salient differences between the known signature and the questioned signature occur in the initial letter and the final flourish (remembering that an Arab writes from right to left). Thus, plaintiff seeks to explain away the fact that in none of the 450 known signatures does the final flourish extend beyond the initial loop as it does in each of the questioned signatures.

We reject this analysis since we find more persuasive in its totality the testimony of defendant's expert, Joseph P. McNally. We recognize plaintiff's claim that McNally's analysis suffers because it stresses the comparison of a known signature and a questioned signature on particular checks, whereas plaintiff's expert focuses more on a comparison of features found in any of the known signatures with those found in any of the questioned signatures, but we find plaintiff's analysis unconvincing on the facts as asserted by plaintiff. If plaintiff's version of the signing of the countersignatures is to be believed, Barghouthi II signed his name 150 times in ten

to twelve minutes, without hesitation or studied movements, yet with complete consistency varied but two characteristics of his usual signature—the final flourish and the initial loop. No doubt with much effort and practice this feat could be accomplished but we doubt that it occurred. Under the Uniform Commercial Code (hereinafter the "UCC" or the "Code"), adopted in major part by New York, whose law we apply,[3] once a defendant has raised the issue of forgery the burden of persuasion shifts back to plaintiff. UCC § 3–307(1)(a). *See also* Official Comment 1 to this section. We find that plaintiff has not sustained this burden and that the countersignatures are forgeries. We find, however, that they are "latent" not "patent" forgeries, *i.e.*, that the average person would not find the signatures obviously different.

## II. *The Checks Were Not Countersigned in Xanthopoulos' Presence*

Having found that the countersignatures were latent forgeries, we next consider whether plaintiff has sustained his burden of proving that he obtained the checks under circumstances which nevertheless obligate Cook to honor them, *i.e.*, that they were countersigned in his presence under circumstances that did not put him on notice of the forgery. The significance of these circumstances will be explained below, but at this point we simply find the fact that plaintiff has failed to meet his burden. In the first place, plaintiff's testimony is wholly uncorroborated. Xanthopoulos failed to call his brother at trial though he testified that his brother had witnessed the countersignings. Transcript at 40. In addition, plaintiff is simply not a witness worthy of belief. Much of his testimony was inherently incredible, such as his contentions that he had not discussed a fee with Barghouthi II before the transaction took place, Transcript at 21, 107; that he had failed to ask Barghouthi II many

---

3. Defendant contends that New York law should apply in this case, Defendant's Proposed Conclusions of Law at ¶ 1, and plaintiff has not disagreed. Given that this action was brought in New York, and that New York has as much relationship to this dispute as any other state and that the parties rely on New York law, we will apply the law of New York.

questions about a building that Barghouthi II had said he wanted plaintiff to design, Transcript at 17, 60, 39;[4] and that the time interval in which the purported counter-signings took place was a mere 10 to 12 minutes in length, Transcript at 43. Plaintiff's credibility about the entire affair is also called into question by the fact that he was testifying about his own participation in what he concededly knew to be an illegal transaction in Greece. Transcript at 12.[5] Moreover, his demeanor while testifying belied an effort to reveal the full truth.

Cook urges that plaintiff should be denied recovery because the underlying transaction in which plaintiff was engaged was an unlawful violation of Greek currency laws. Although we attribute some, but not great, significance to this fact in assessing plaintiff's credibility, we do not deny recovery solely because of this circumstance. For these purposes we assume that the underlying nature of the transaction is, in and of itself, irrelevant to a travelers check company which issues checks in these denominations and under these circumstances and which holds the checks out to be essentially the equivalent of cash. We consider for purposes other than plaintiff's credibility solely the factors which relate directly to the integrity of the instrument itself, *i.e.*, the countersigning, rather than the intended use to be made of the checks. We simply do not believe that plaintiff has truthfully described how he obtained the checks and how they were countersigned.

### III. *Defendant Cook is Not Liable to Plaintiff Xanthopoulos on the Travelers Checks*

#### A. *The Nature of a Travelers Check*

It is necessary to begin with a brief description of travelers checks in general and Cook travelers checks in particular. A travelers check is an instrument for payment that combines the marketability of cash with the safety of a bank draft.[6] Its issuer, here defendant Cook, prints the check, customarily in one of several standard denominations, and offers it for sale. The purchaser, here Barghouthi I, buys the instrument and signs it in the presence of the issuer.[7] The nature of the agreement between the issuer and the purchaser is that the issuer will replace the check if it is lost or stolen, thus providing a safety net to the purchaser that is unavailable with cash. To use the check, the purchaser need only countersign it in the presence of the person to whom he is tendering it (hereinafter "the acceptor"). The acceptor, here Xanthopoulos, is required to have the countersigner countersign in the acceptor's presence so that the acceptor can compare the two signatures for similarity. This offers some protection against the thief who would find it difficult to artfully forge the purchaser's signature while under observa-

4. Had plaintiff testified that he stood to gain from this risk-laden transaction merely the $900–$1000 commission paid by Tambakis, his story would have been inherently incredible. Had he testified, on the other hand, that he was actually being paid a substantial fee, this would have undercut his claim that he believed the checks were not stolen. We believe that plaintiff's claim that Barghouthi II had held out the lure of having plaintiff design a building was simply an effort by plaintiff to extricate himself from the horns of this dilemma by showing some other motivation for engaging in the transaction.

5. Plaintiff later testified that he believed the transaction was legal, Transcript at 69, and tried to explain away a prior inconsistent statement made in a deposition, *id.* at 105. Nonetheless, in light of the totality of the evidence and the circumstances surrounding the exchange, the Court concludes that Xanthopoulos believed he was engaging in an illegal transaction.

6. For a general discussion of properties of travelers checks, see *Citicorp v. Interbank Card Ass'n*, 478 F.Supp. 756, 759 (S.D.N.Y.1979); Hawkland, "American Travelers Checks," 15 *Buff.L.Rev.* 501 (1966); H. Bailey, *Brady on Bank Checks* § 1.14 (5th Ed.1979); Annot., "Rights of One Who Acquires Lost or Stolen Traveler's Checks," 42 *A.L.R.3d* 846 (1972).

7. Sometimes the purchaser must pay a commission for the purchase of the check and sometimes not. In either case, there is consideration for the transaction running to the issuer as it gets the use of the purchaser's cash while waiting for the ultimate recipient of the check to redeem it with the issuer. *Citicorp, supra,* 478 F.Supp. at 760.

tion. The acceptor then redeems the check with the issuer, usually through the intermediary of the acceptor's own bank, and receives cash equalling the face value of the check.

Cook's travelers checks, apparently unlike others, come with a written "Payment Guarantee," guaranteeing payment to an acceptor if he meets certain conditions. Those conditions include having "the customer" countersign the checks in the acceptor's presence and then comparing the signature with the countersignature to "assure their likeness;" *see* Defendant's Exhibit 5 at 13. On the face of Cook's checks, over the line for the purchaser's countersignature, is written the following: "Countersign here in the presence of paying cashier." Underneath the line there is this inscription: "When this check is countersigned by the holder we will pay to the order of". The acceptor may write his name in the space following this inscription, but apparently Cook and other travelers check issuers will pay on the check even if the space is left blank.[8]

### B. *The Uniform Commercial Code*

Commercial paper is governed by Article 3 of the Uniform Commercial Code. It provides that if a given type of commercial paper is found to be a "negotiable instrument" and it is "negotiated" to a "holder" who qualifies as a "holder in due course" ("HIDC") then that "holder in due course" takes the instrument free from many of the defenses that the issuer could have raised against previous holders of the instrument, such as the defense here that the instrument was stolen.

We find that the travelers checks in issue are indeed negotiable instruments, but that Xanthopoulos never became their holder. Since he was not a holder, he could not have been a holder in due course.[9] Therefore, he cannot collect on the travelers checks.

### 1. *Cook's Travelers Checks are Negotiable Instruments*

■ Official Comment 4 to UCC § 3–104 makes clear that "[t]raveler's checks in the usual form ... are negotiable instruments under this Article when they have been completed by the identifying signature." *Accord, Gray v. American Express Co.,* 34 N.C.App. 714, 239 S.E.2d 621, 623 (1977). Plaintiff has urged that the "identifying signature" noted in the comment refers to the countersignature made when the purchaser tenders the check to the acceptor. We reject his argument, finding instead, as defendant contends, that the check becomes negotiable at the time the purchaser first signs.[10] The four required character-

---

8. A 1938 Note in the Yale Law Journal observed that one major travelers check company conservatively estimated that more than half of its travelers checks were redeemed with the "Pay to the Order of" space left blank. 47 *Yale L.J.* 470, 474 n. 23 (1938).

9. Since we find that plaintiff is not a holder in due course ("HIDC") it is unnecessary to consider his claim under U.C.C. § 3–407(3) that as an HIDC he may enforce the travelers checks because they were incomplete instruments that were later completed before being negotiated to him. We note in passing that even were plaintiff an HIDC this argument would be lacking in merit. The travelers checks were complete and negotiable by the time the forger received them. *See infra.* His countersignature was an attempt to effect a transfer, not a completion of an incomplete instrument. The checks might be deemed incomplete instruments had they been stolen before any signature had been affixed. *Accord, First Nat'l City Bank v. American Broad-*

casting Co., 68 Misc.2d 861, 328 N.Y.S.2d 326, 330 (N.Y.Sup.Ct.1971). *Ashford v. Thomas Cook & Son (Banker),* 52 Hawaii 113, 471 P.2d 530 (1970) (issuer bears risk when blank travelers checks are. signed by thief and then properly countersigned in acceptor's presence; U.C.C. not in effect); *See also Sendery v. American Express Co.,* 16 U.C.C.Rep. 753 (N.Y.Sup.Ct.1975) (issuer held liable to HIDC who took checks that had been countersigned out of his presence and which turned out to have been stolen in blank; no forgery, however, seemed to be involved).

10. Defendant supports the proposition by citing two pre-Code cases that refer to the countersignatures as an "ordinary endorsement", indicating that the check had already been negotiable at the time it was countersigned. *Sullivan v. Knauth,* 161 A.D. 148, 152, 146 N.Y.S. 583, 586 (N.Y.App.Div.1914), *aff'd* 220 N.Y. 216, 115 N.E. 460 (1917); *First Nat'l City Bank of New York v. Frederics-Helton Travel Service,* 29 Misc.2d 1041, 1043, 209 N.Y.S.2d 704, 707 (N.Y.Sup.Ct.1961).

istics for an instrument to be considered negotiable under the Code, set forth at UCC 3–104(1) [11], are met when the purchaser's initial signature is placed on the check. First, the instrument has been "signed by the maker or drawer." UCC 3–104(1)(a). The "maker" of a travelers check, like the maker of a bank check, is the bank upon which the check is drawn, here Cook. The purchaser has given Cook cash and Cook in turn has given him a note for that amount. The note is effectively "payable to [the] order" of the purchaser, satisfying the second requirement of negotiability. UCC 3–104(1)(d). The note is "payable on demand," satisfying the third requirement, UCC 3–104(1)(c), and finally, it contains "an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article." Effectively Cook has given a negotiable check to the purchaser, here Barghouthi I. In transferring the check to the acceptor, Xanthopoulos, Barghouthi II simply attempted to negotiate it. As one commentator has noted: "The [first] signature, in effect, put the check in 'order' form. The countersignature converts it to bearer paper because it makes it negotiable by delivery alone [pursuant to UCC § 3–202(1)]." Hawkland, *supra*, 15 Buff.L. Rev. at 515.

For purposes of determining whether Xanthopoulos was a holder of the travelers checks, however, it matters not at which point the checks could have become negotiable instruments. By the time plaintiff took them, they were sufficiently completed so that were all the signatures valid, the checks would have been negotiable.

### 2. *Xanthopoulos is Not a Holder*

The holder of a negotiable instrument may "enforce payment in his own name." U.C.C. 3–301. The question that is really at the heart of this case is whether Xanthopoulos is such a "holder." We find that he is not.

■ A "holder" is defined in section 1–201(20) of the Code as "a person who is in possession of ... an instrument ... issued or indorsed to him or to his order or to bearer or in blank." When Cook first issued the traveler's checks in question to Barghouthi I, Barghouthi I thus became a holder. Had Barghouthi I—like countless travelers each day—properly countersigned, *i.e.*, indorsed, his checks over to Xanthopoulos, Xanthopoulos would have then become the uncontested holder of properly negotiated travelers checks. But because the countersigner was not Barghouthi I but rather the imposter Barghouthi II, Cook is not liable on the instrument.

The crux of Cook's argument is that "a forged countersignature on a travelers check ... [is] the equivalent of a forged indorsement on a check [;] ... and the U.C.C. entitles an issuer to refuse payment on such checks." Defendant's Trial Memorandum at 8. Cook cites to several provisions in the Code that make it clear that as a general matter a forged signature is tantamount to no signature and, therefore, cannot be used to effectively negotiate a negotiable instrument.[12] Cook then adds,

---

**11.** U.C.C. 3–104(1) defines a negotiable instrument as follows:

(1) Any writing to be a negotiable instrument within this Article must

   (a) be signed by the maker or drawer; and

   (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article; and

   (c) be payable on demand or at a definite time; and

   (d) be payable to order or bearer.

**12.** The relevant U.C.C. provisions include § 4–401 (drawee may not charge drawer's account when it pays a check bearing a forged indorsement); § 3–507 (drawer may refuse payment without dishonor where, by virtue of improper indorsement, the instrument was not duly presented); § 3–202 (an instrument payable to order must carry "any necessary indorsement" to be properly negotiated); § 3–404 (a forged indorsement "is wholly inoperative as that of the person whose name is signed unless he ... is precluded from denying it").

*See also, Merrill, Lynch, Pierce, Fenner & Smith v. Chemical Bank,* 57 N.Y.2d 439, 442 N.E.2d 1253, 1256, 456 N.Y.S.2d 742, 745 (1982); *Atlantic Bank of New York v. Israel Discount Bank,* 108 Misc.2d 342, 441 N.Y.S.2d 315, 317

correctly, that generally under the U.C.C. if there is a forgery, "the loss falls not upon the bank or issuer, but upon the first solvent party in the transfer stream after the one who forged the indorsement ... *i.e.*, the person who cashed the instrument for the forger." Defendant's Trial Memorandum at 8. *See* J. White & R. Summers, *Uniform Commercial Code* § 15–1, at 581 (2d ed. 1980); Bailey, *Brady on Bank Checks* § 23.5 (5th ed. 1979). Thus, under Cook's analysis, with Barghouthi II gone with the money, Xanthopoulos should bear the loss.

Xanthopoulos attempts to escape Cook's generalizations by contending that despite the forgery he is a holder because Cook should be precluded from questioning the authenticity of the Barghouthi countersignature.[13] In support of this contention, plaintiff puts forward several theories: first, that the terms of the "payment guarantee" provide that Cook will pay on latent forgeries. Second, that the custom of trade in the travelers check industry is to pay on latent forgeries. And finally, that Cook's own negligence contributed to the making of the forged countersignatures and thus Cook should be precluded from questioning their authenticity. Because, however, Xanthopoulos did not prove that he had Barghouthi II countersign the checks in his presence under circumstances that did not put him on notice of the forgery, none of plaintiff's theories can prevail.

### a. The Payment Guarantee

■ One of the conditions of the payment guarantee is that the acceptor have the countersigner countersign in the accep-tor's presence. This condition is obviously material and we find it was not met. Therefore the guarantee was not put into effect.[14]

### b. The Custom of Trade in the Travelers Check Industry

Plaintiff also contends that the "custom of trade" in the travelers check industry is "to honor travelers checks even with forged endorsements when presented by a holder in due course if countersigned in the presence of the holder." Plaintiff's Pre-Trial Brief at 26. While defendant recognizes that the Code provides that a "usage of trade" in an industry shall be used by the court in interpreting an agreement between parties, it disputes plaintiff's contention about what the usage is in the travelers check industry. The court, however, need not resolve this factual issue as plaintiff has failed to put forward any evidence that issuers of travelers checks pay on checks bearing forged countersignatures made outside of the presence of the acceptor or under circumstances that put the acceptor on notice of the forgery.

The Court is mindful of several cases that have said that travelers checks should be treated more like cash than should other negotiable instruments. *See, e.g., Ashford v. Thomas Cook & Son (Bankers)*, 52 Hawaii 113, 471 P.2d 530, 533–34 (1970); *First Nat'l City Bank v. ABC*, 68 Misc.2d 861, 328 N.Y.S.2d 326, 329 (N.Y.Sup.Ct.1971); *American Express Co. v. Andarko Bank & Trust Co.*, 179 Okl. 606, 67 P.2d 55 (1937); *Accord, Citicorp v. Interbank Card Ass'n*, 478 F.Supp. 756, 759 (S.D.N.Y. 1979); *Peoples Savings Bank of Grand*

(App.Term 1981); *Millens v. Kingston Trust Co.*, 118 Misc.2d 512, 461 N.Y.S.2d 938, 940 (Ulster Co.Sup.Ct.1983) (per curiam).

**13.** The Code recognizes that there are situations where justice and fairness require that a party be "precluded" from denying the validity of his own signature, such as "where he expressly or tacitly represents to an innocent purchaser that the signature is genuine." U.C.C. § 3–404(1), Official Comment 4.

**14.** The payment guarantee also requires the acceptor to accept the check "in good faith." This really adds nothing as "[e]very contract or duty within ... [the U.C.C.] imposes an obligation of good faith in its performance or enforcement." U.C.C. § 1–203. Because we find he is not a holder it is unnecessary to reach the issue of plaintiff's good faith, which comes into play in determining whether a holder qualifies as an HIDC. Nor need we consider any evidence relating to the final condition under the guarantee that the acceptor "deposit ... [the checks] at ... [his] bank with ... [his] regular deposit."

*Haven, Mich. v. American Surety Co.*, 15 F.Supp. 911, 913 (N.D.Mich.1936). None of these cases, however, involved a forged countersignature made outside of the acceptor's presence or under circumstance which put the acceptors on notice of the forgery. Nor has such a case been brought to the Court's attention. There is much to be said for the proposition that the public has come to accept travelers checks as a cash equivalent and so the checks have acquired "negotiable characteristics" not found in other instruments, *see Ashford, supra.* Nevertheless, when a travelers check has been countersigned out of the acceptor's presence, it creates a risk for which the issuer has not bargained. This is also true if the checks are countersigned in the acceptor's presence under circumstances putting the acceptor of the checks on notice of the forgery.

### c. *Defendant's Alleged Negligence*

■ Plaintiff contends that pursuant to U.C.C. § 3–406 Cook should be precluded from questioning the forged countersignatures because Cook's own negligence "substantially contribute[d] to" their making. In support of this proposition, plaintiff cites many measures that Cook could have taken to insure that innocent acceptors did not take checks that were reported lost or stolen.[15] Cook's failure to take any of these measures, however, does not rise to the level of negligence. Acceptors who have had the checks properly countersigned in their presence are sufficiently protected by Cook's guarantee and possibly by the custom of the travelers check industry. The cases cited by plaintiff in support of his contention, *Savemart v. Bowery Savings Bank*, 117 Misc.2d 947, 461 N.Y.S.2d 144 (App.Term 1982) and *Michaeli v. The Greater New York Savings Bank*, 121 Misc.2d 840, 469 N.Y.S.2d 279 (Queens Co. Civ.Ct.1983) are easily distinguishable from the case at hand. Those cases involved

---

**15.** For example, plaintiff notes, Cook could have printed a 24-hour telephone number on its checks, requiring acceptors to call such numbers before taking the checks. Cook does provide its purchasers with such an "Any-Time

teller's checks stolen in blank from defendant banks. They were signed by persons who forged the bank's authorized signatures before negotiating the checks to the plaintiffs. In *Michaeli*, the court held that the defendant bank was precluded from contesting the forged signature because the "bank's failure to take any precuations other than the self-protecting expedient of a stop payment order substantially contributed to the making of the ... unauthorized ... check." 469 N.Y.S.2d at 281. The *Savemart* court held similarly on the law, remanding the case to determine whether the bank had indeed been negligent.

■ Signed teller's checks, however, differ from the Cook travelers checks as Xanthopoulos took them. Signed tellers checks are the equivalent of cash. Travelers checks do not become cash equivalents until they are signed *in the presence of the acceptor under circumstances that do not put the acceptor on notice of the forgery.* Indeed, this difference between the two instruments is the reason travelers carry travelers checks rather than teller's checks. Had Cook's travelers checks been stolen in blank from Cook, signed by the thief and then countersigned in the presence of an acceptor, who was a holder in due course, only then would we have a situation analogous to *Savemart* and *Michaeli*. *See* Annot., *supra,* 42 A.L.R.3d at 851. *See also supra* note 9.

### IV. *Defendant is Not Liable to Plaintiff in Tort for Negligence*

The parties agree that absent a duty of care there can be no tort of negligence. *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). Whatever the level of care that may be owed to an innocent acceptor in whose presence travelers checks are countersigned under nonsuspicious circumstances, no duty of care was owed by Cook to plaintiff.

Line" so that they may report checks lost or stolen. Plaintiff also claims Cook should have more thoroughly investigated Barghouthi's story before replacing the checks that he had reported stolen.

For the reasons stated above, judgment will enter for defendant dismissing the complaint.

SO ORDERED.