TEXAS IMPORTS, Appellant,

v.

Edwin ALLDAY, Appellee.

No. 12–81–0062–CV.

Court of Appeals of Texas, Tyler.

March 24, 1983.

Norman J. Riedmueller, Tom Alexander, Butler, Binion, Rice, Cook & Knapp, Houston, for appellant.

Andrew S. Hanen, Taylor M. Hicks, Andrews & Kurth, Houston, for appellee.

COLLEY, Justice.

These appeals result from a take-nothing judgment non obstante veredicto entered by the trial court against both parties in a breach of contract suit instituted by appellant Texas Imports, a general partnership comprised of L.F. McCollum, James H. Chadwick and Ronald P. Cuenod (hereafter TI), against Edwin Allday (Allday died pending this appeal and his widow, Mrs. Doris Fondren Allday, in her capacity as independent executrix of his estate was substituted as appellee). Allday urged a counterclaim in the suit. The contracts between the parties involved in this appeal were for the sale and purchase of Simmental cattle, an exotic or elite breed of cattle imported from France. TI went to trial on its second amended original petition which alleged three causes of action for breach of contracts to purchase the cattle. The first cause of action pertained to a contract memorialized by writings which consist of an original letter of agreement signed by the

parties dated July 2, 1974,[1] and two written amendments to the original writing signed by the parties on July 19, 1974.[2] and January 27, 1975.[3] These writings were referred to at trial as involving the "first shipment" of cattle. The second and third causes of action asserted by TI against Allday were referred to at trial as pertaining to the "second shipment" of cattle. No complaint is made by TI of the take-nothing judgment rendered against it with regard to the cause of action asserted in TI's pleading respecting the "second shipment" of cattle. However, since the parties to this appeal referred to the two transactions as "first shipment" and "second shipment" both at trial and in their respective briefs in this court, we likewise so refer to them for the sake of clarity.

TI, owner of forty-nine purebred Simmental cattle (three bulls and forty-six heifers) located on Soda Ranch in Hokkaido, Japan, agreed to sell the animals to Allday. The agreement provided that Allday would, at his own expense, travel to Japan to inspect the cattle, ". . . their pedigrees and other pertinent documentation . . .," and notify TI as to whether or not the agreement was confirmed or terminated; it further provided that if Allday was ". . . satisfied with the foregoing inspection . . .," then ". . . the agreement shall continue in full force and effect, Texas Imports shall be bound to sell the subject cattle and the undersigned [Allday] shall be bound to purchase same upon the following terms."

The rest of the agreement consists of twelve numbered paragraphs. Paragraph 1 sets forth the purchase price at $25,000.00 per head. Paragraph 2 states that the manner of payment of the purchase price would be 10% of the total amount due when the agreement was confirmed after the inspection in Japan by Allday, and provided that the balance was due and payable when the cattle are delivered to Allday ". . . in sound healthy condition" accompanied by appropriate documents showing pedigree of the animals acceptable to the American Simmental Association. Paragraph 3 of the original letter of agreement provided for delivery to Allday after a period of quarantine in the continental United States at the United States Department of Agriculture Quarantine Station in Clifton, New Jersey. This paragraph 3 was later amended by the parties to provide for delivery at Allday's Pitchfork Ranch near Crockett, Houston County, Texas, allowing Allday a three-day period following delivery of the cattle to inspect the same. Paragraph 4 required TI to use diligence to protect and care for the cattle and maintain the animals in a healthy and sound condition until delivery to Allday. Paragraph 5 obligated TI at its own expense to maintain the cattle during the periods of quarantine both in Japan and the United States in accordance with the law and the rules and regulations of the United States Department of Agriculture. Paragraph 6 permitted Allday to request breeding of the heifers in Japan prior to importation into the United States and provided that TI would be obligated, with the approval of their Japanese agent Soda and the United States Department of Agriculture, to cooperate in any manner to accommodate the request of Allday for such breeding or impregnation of the animals. Paragraph 7 provided that TI shall warrant title and shall warrant that the cattle ". . . are in a good, sound and healthy condition at the time of delivery . . ." to Allday. That paragraph also contains provisions for fertility testing of both the male and female animals by Allday, with the agreement of TI as to the selection of the veterinary authority, and sets forth a time frame for the testing. Paragraph 8 relates to investment tax credits which are not pertinent here. Paragraph 9 speaks to the failure to perform by TI due to the death or sickness of any cattle, or the failure of any cattle to successfully meet the requirements of quarantine or to meet the fertility test, and provided for a per head adjustment of $25,000.00 against the purchase price and return of all such animals to TI upon which an adjustment is made. Paragraph 10 concerns the failure of either party to perform

**1, 2, 3.** Plaintiff's Exhibits 1, 3 and 4.

and provides each damaged party shall have the right and resort to such relief as provided by law or equity for breach of the contract. Paragraph 11 provides for a refund of the 10% down payment made by Allday to TI if TI fails to perform. Paragraph 12 provides for status reports to be made by TI and will be hereinafter quoted in toto in connection with the jury's answers to Special Issues 7 and 8.

Trial was to a jury, which was selected on November 19, 1979, and the case was submitted to the jury on December 4, 1979. The jury's verdict was received by the court on December 5, 1979. Nine special issues were submitted to the jury, with respect to the "first shipment" of cattle, upon which the jury made the following findings, to-wit:

### SPECIAL ISSUE NO. 1

That TI substantially performed its agreement to deliver Allday forty-nine head of cattle [first shipment] in good, sound and healthy condition;

### SPECIAL ISSUE NO. 2

That TI undertook the management for resale [of the first shipment of cattle] in good faith and in a commercially reasonable manner;

### SPECIAL ISSUE NO. 3

That TI incurred reasonable expenses in transportation, care and custody of First Shipment cattle between the dates of January 29, 1975 and November 28, 1979, in the amount of $82,512.00;

### SPECIAL ISSUE NO. 4

The jury found $0 was a reasonable amount of attorney's fees incurred by TI in the suit on First Shipment of cattle;

### SPECIAL ISSUE NO. 5

That one or more of the forty-nine head of cattle were not in a good, sound and healthy condition when delivered to Allday's ranch on January 29, 1975;

### SPECIAL ISSUE NO. 6

That ten head of cattle were not in good, sound and healthy condition when delivered by TI to Allday's ranch on January 29, 1975;

### SPECIAL ISSUE NO. 7

That with regard to one or more head of cattle [First Shipment] delivered to Allday's ranch, TI failed to comply with the requirements of paragraph 12 of the written contract which reads:

12. Status Reports. Texas Imports agrees to keep the undersigned fully informed as matters contemplated hereby progress, shall render periodic status reports to the undersigned and shall immediately notify the undersigned of any occurrence having a material effect upon this agreement or the cattle subject hereto. As matters progress, Texas Imports agrees to cooperate with the undersigned in arranging for and facilitating such periodic inspections of the cattle as the undersigned might reasonably request.

### SPECIAL ISSUE NO. 8

That fourteen animals [First Shipment] were delivered by TI to Allday's ranch not in compliance with the requirements of paragraph 12 of the written agreement;

### SPECIAL ISSUE NO. 9

That first shipment cattle were sold by TI for the sum of $593,921.34;

NOTE: The record shows that first shipment of cattle when rejected by Allday were redelivered to TI upon an agreement of the parties that such redelivery would not prejudice either party's legal rights on the contract between them.

After the court received the jury's verdict, both TI and Allday filed motions for judgment. TI's amended motion for judgment asked the court to disregard the jury's an-

swers to Special Issues 5, 6, 7 and 8 and render judgment for TI in the amount of $591,090.66 based on the remaining issues answered by the jury. Allday's motion for judgment requested the court to disregard the answer to Special Issue No. 1 and enter judgment based on the remaining issues of the jury in his favor in the amount of $122,500.00 plus interest.

The trial court, on the 31st day of March, 1980, signed a judgment decreeing that TI retain ownership and possession of all cattle and their progeny involved in the action and otherwise that TI take nothing and that Allday take nothing on his counterclaim for return of the down payment. Each party was ordered to pay his own costs in the trial court. Following the entry of judgment TI filed an amended motion for new trial which was overruled by the trial court.

TI presents six points of error in this appeal. By points three and six TI asserts that the evidence was legally and factually insufficient to support the jury's answers to Special Issues 5, 6, 7 and 8.

To consider points three and six, regarding Special Issues 5 and 6, it is necessary that we briefly discuss the evidence shown by the record. Forty-nine Simmental cattle (46 females and 3 bulls) owned by TI, and located in Hokkaido, Japan, under the care of Soda (maintaining the cattle under a contract with TI), were shipped to the U.S. Department of Agriculture's Quarantine Station in Clifton, New Jersey, and from there were delivered to Allday's Pitchfork Ranch near Crockett, Houston County, Texas, on the 29th day of January 1975.

Under the contract between the parties (reviewed earlier) Allday had three days to inspect the animals upon delivery. Several veterinarians and experienced cattlemen, including Allday, examined each animal to determine its condition. The record demonstrates that it was undisputed that fourteen females were pregnant at the time of the delivery and that no breeding status records were furnished Allday identifying the sire of the calves carried by the cows during the three-day inspection period within which Allday, under the contract, was obligated to accept or reject the cattle.

The testimony regarding the health and soundness of the animals at the time of this delivery was conflicting. Dr. Cartwright, who holds a Ph.D. degree in Animal Breeding and Genetics from Texas A & M University, testified that on January 31, 1975, he examined each animal and that nine females were not healthy and not sound. Allday testified that one bull had an infectious growth on its penis. Dr. Randall Grooms, a witness for TI, testified that four females were unsound and unacceptable. Dr. Cartwright testified that four of the nine animals he found to be unsound and were carriers of defective genes, which was manifested by a condition known as "double muscling;" that such condition was an unsoundness in Simmental cattle for the reason that it affected the fertility of the females and made calving difficult. Dr. Grooms testified that, in his inspection of the forty-nine cattle in March of 1975, he saw no evidence of "double muscling" in the Simmentals.

The evidence bearing on the issues submitted to the jury in Special Issues 5 and 6 was, as heretofore stated, conflicting. After a careful review of the record, disregarding all evidence contrary to the jury's findings on said issues and considering only the evidence supporting the same, we conclude that the evidence is legally sufficient to support the answers to these issues. Turning now to the contention of TI that the evidence is factually insufficient to support such findings made by the jury, and carefully weighing all of the evidence adduced at trial bearing on these findings, i.e., both favorable and unfavorable to such findings, we conclude that the evidence is also factually sufficient to support the jury's answers to Special Issues 5 and 6. Therefore TI's points of error three and six challenging the legal and factual sufficiency of the evidence to support such issues are overruled.

Under TI's first point of error it complains that the trial court erred in ad-

mitting evidence of compromise settlement negotiations between Allday and TI. The point is general and vague as stated, and is not properly briefed under the rules. However, referring to the record we find that the trial court sustained TI's objection to the testimony on cross-examination of McCollum (one of the partners of TI) as to whether or not he was present when a cashier's check, for 27 of the cattle found acceptable by Allday, was tendered to Chadwick (another partner of TI). The trial court, outside the presence of the jury, announced to counsel that he was going to exclude any evidence concerning the tender of the check to TI. Allday then attempted to make a bill of exceptions to the excluded testimony by McCollum, but the witness testified he had no personal knowledge of the matter. The record also shows that appellee made a bill of exceptions on the testimony of his witness, Wm. R. Lummis (formerly an attorney for Allday), outside the presence of the jury regarding the tender by Allday of payment for the cattle which Allday contended conformed in all respects to the contract standards. The record shows that following the completion of the bill of exceptions, Allday did not immediately offer said testimony given by Lummis on the bill and the court made no ruling thereon. Later, during re-direct examination of the witness Lummis before the jury, the witness was asked, " . . . let me just ask you, was in fact a cashier's check obtained and tendered for the acceptable animals in that first shipment?" TI's objection was, "I object.to that Your Honor. It is an improper question. The court has already ruled on it once." The trial court overruled such objection. Following that ruling, on direct examination numerous questions concerning the same subject matter were asked of, and answered by, the witness Lummis consuming some eleven pages of the record. No objections were made by TI to the subsequent testimony of Lummis on the grounds that the same constituted evidence of compromise settlement negotiations between the parties. In fact, not only did TI fail to object, but on cross-examination of Lummis elicited facts about

the tendered cashier's check. Since the defendant's objection at trial was general, the objection was correctly overruled by the trial court. *David v. Campbell,* 572 S.W.2d 660 (Tex.1978). Further, any error was waived by the failure of TI to object to testimony on the same subject by the same witness and by the cross-examination of the witness by TI above quoted. *Simmons v. Capital Diesel & Industrial Mach. Wks., Inc.,* 380 S.W.2d 191, 192 (Tex.Civ.App.— Amarillo 1964, writ ref'd n.r.e.). In addition, the objection at trial was not the same as the objection urged in the point of error here and presents nothing for review. *Wilkerson v. Pic Realty Corp.,* 590 S.W.2d 780 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ).

■ Notwithstanding our conclusions just mentioned, we have examined the testimony objected to and find that the same was not testimony about a compromise or settlement offer in the case but was a tender of payment for twenty-seven cattle, which Allday contended conformed to the contract, and not an offer to settle a dispute by making some concession or requiring a release as a consequence of making the offer. No abuse of discretion by the trial court is shown. *Ditto v. Piper,* 244 S.W.2d 547 (Tex.Civ.App.—Fort Worth 1952, writ ref'd n.r.e.). We recognize the well-established rule that offers made to compromise disputed claims are inadmissible. *McGuire v. Commercial Union Ins. Co. of N.Y.,* 431 S.W.2d 347 (Tex.1968). The underlying policy for exclusion of evidence of compromise and settlement offers is to encourage settlements. *McGuire, supra; Otwell v. Scott,* 425 S.W.2d 9 (Tex.Civ.App. —Texarkana 1968, no writ). Dean McCormick states such rule of exclusion as being really one of privilege protecting settlement negotiations. McCormick, *The Scope of Privilege in the Law of Evidence,* 16 Tex. L.R., 447, 457 (1938). See also Ray, Texas Law of Evidence, Section 1142 (3rd Ed. 1980). The test of whether the evidence amounts to an offer of compromise settlement seems to be as to whether or not something is given up by one of the parties

for the sake of avoiding litigation (buying peace) where some concession is made by one or both of the parties. *Sawyer v. Willis,* 310 S.W.2d 398 (Tex.Civ.App.—San Antonio 1958, no writ). At any rate we have carefully examined the testimony given by Lummis and hold that it did not constitute evidence of a compromise or an offer to settle a disputed claim but rather was an unconditional tender which Allday was entitled to make under Section 2.601, Texas Business & Commerce Code,[4] and was therefore admissible in this case. Point of error No. 1 is overruled and Allday's cross-point No. 3 is sustained.

By the second point TI asserts that the trial court erred in failing to enter judgment for TI on the jury's answer to Special Issues 1, 2, 3, 4 and 9 notwithstanding the remaining answers of the jury. TI's argument on this point urges that since the jury found that TI had "substantially performed" the contract between the parties (Special Issue No. 1), that all other findings in the verdict except those mentioned should be disregarded as immaterial. TI cites numerous cases on contract actions involving the doctrine of substantial performance including *Del Monte Corp. v. Martin,* 574 S.W.2d 597 (Tex.Civ.App.—San Antonio 1978, no writ). None of these cases including *Del Monte Corp. v. Martin, supra,* address the application of the Texas Business & Commerce Code to the respective fact situations. The opinion in *Del Monte* by the San Antonio court did not discuss the facts of that case nor did it address the application of the Texas Business & Commerce Code thereto. Therefore we do not find it authoritative here. Both TI and Allday take the position that the dispute here is controlled by the Texas Business & Commerce Code. TI's position is that Allday accepted the cattle following his inspection of the cattle through his agent in Japan, and thus the provisions of Section 2.608 of the code became applicable, and the jury's answer to Special Issue No. 1, "... that Texas Imports substantially performed

its agreement to deliver to Edwin Allday the original forty-nine (49) head of cattle in the first shipment in a good, sound and healthy condition...." rendered the jury's specific findings in answer to Special Issues 5, 6, 7 and 8 immaterial, thereby entitling TI to a judgment for the damages resulting to it because of Allday's refusal to pay the balance of the purchase price for the forty-nine animals.

Allday argues under his cross-point No. 4 that the doctrine of "substantial performance" is not applicable in this case, but contends that the findings of the jury in Special Issue No. 1 does not conflict with the findings made in response to Special Issues 5 and 6. Allday further asserts that under Section 2.601 of the code he had the right to reject all cattle where one or more of the animals were nonconforming according to the provisions of the contract between the parties.

▮ After consideration of these arguments, we conclude that first we must address the effect and relationship of the jury's findings in response to Special Issues 1, 5 and 6. In our opinion, an apparent conflict exists between the answers to No. 1 and the answers given to 5 and 6. We believe, however, that the findings made by the jury in response to Special Issues 5 and 6 are "dominant" that is, controlling over the findings made in response to Special Issue No. 1 for the following reasons: (1) the findings made in Special Issue No. 1 are general and the findings made in Special Issues 5 and 6 are specific. *Barclay v. C.C. Pitts Sand & Gravel Co.,* 387 S.W.2d 644 (Tex.1965); *Cunningham v. Suggs,* 340 S.W.2d 369 (Tex.Civ.App.—Eastland 1960, writ ref'd n.r.e.); (2) the finding made in Special Issue No. 1 is not an issue controlling an ultimate fact since the doctrine of substantial performance is not applicable under Section 2.601, which controls this breach of contract dispute under the facts in the record. The so-called "perfect tender

---

4. All code references refer to the Tex.Bus. & Com.Code Ann. (Vernon 1968), unless otherwise noted.

rule" is expressed in the language of said section, and "[t]here is no room in commercial contracts for the doctrine of substantial performance." *Mitsubishi Goshi Kaisha v. J. Aron & Co.,* 16 F.2d 185 (2d Cir.1926); See also, R. Nordstrom, *Handbook of the Law of Sales,* Section 102 (1970); and Krahmer, *Commercial Transactions,* 34 Southwest L.J. No. 1, 199, 207 (1980). Thus, Special Issue No. 1 should not have been submitted by the trial court, but since it was, the trial court should have disregarded the same. TI's second point of error is overruled and Allday's cross-point No. 4 is sustained.

The evidence establishes conclusively as a matter of law that Allday assigned his rights under the contract to his wife, Doris Fondren Allday, and that following the delivery of the cattle to Allday's ranch on January 29, 1975, and after the inspection of the cattle had been made, Allday elected to accept twenty-seven animals he found to be in conformity with the contract between the parties and seasonably tendered a cashier's check in the amount of $552,500.00 to TI (Chadwick), together with a bill of sale to be executed by TI for the twenty-seven animals in favor of his wife. Such sum just mentioned, together with the 10% down payment of $122,500.00 already made by Allday, equals $675,000.00, representing the contract price for the twenty-seven animals based on a $25,000.00 per head price. In effect, Allday took option (3) of Section 2.601, which provides that he "... may accept any commercial unit or units and reject the rest." [5] We hold that each animal constituted a commercial unit under the record in this case. Section 2.105(f). The evidence shows that following Allday's decision the parties met with their attorneys present to "close" the transaction on the twenty-seven head, but that TI refused the tender of the check and declined to execute the bill of sale to Mrs. Allday covering the twenty-seven animals selected by Allday. Since the jury found ten animals were not in good, sound and healthy condition at the time the animals

were delivered to Allday on January 29, 1975, the cattle (first shipment) failed to conform to the contract and Allday was authorized, under Section 2.601, to accept the twenty-seven head, as he did, and reject the rest. We reject TI's argument that Allday accepted delivery of the cattle following the preliminary inspection made by Walling (Allday's agent) in Japan. The contract clearly provided that Allday's affirmance of the contract following the inspection of the cattle in Japan triggered the down payment and authorized shipment to his ranch in Texas for inspection to determine whether the cattle were in fact sound and healthy as we have heretofore pointed out in our discussion of the contract between the parties. We hold that Allday did not accept the cattle by virtue of his conduct in agreeing to the shipment of the cattle to him in Houston County, Texas, from Japan following the inspection there, and therefore Section 2.608 (revocation of acceptance) is not applicable here. We note also that TI has not contended that it notified Allday that it intended to cure the non-conformity of the cattle or substitute conforming cattle (Simmental) therefore, under Section 2.508(a), (b), or that Allday failed to reject some of the cattle within a reasonable time following their delivery or that the partial rejection by Allday was ineffective because TI was not seasonably notified of such under Section 2.602(a). Therefore we further conclude that Allday's rejection of the twenty-two head of cattle was effective and in compliance with the Texas Business & Commerce Code. Allday's cross-points 1 and 2 are sustained.

By its fourth point TI complains of the trial court's error in overruling its objection to the submission of Special Issues 7 and 8; that such issues were not material to TI's performance of the contract in that the same did not confine the jury to a determination of whether TI substantially performed the contract and further that no pleadings or proof existed showing damages to Allday resulting from the failure of TI to furnish status reports. We are cited to

5. See, Anderson On The Uniform Commercial Code (Volume 2, 1971).

pages 5, 6, 7 and 9 of "Objections and Exceptions the Court's Charge." Examination of the volume of the statement of facts titled "Objections and Exceptions to the Court's Charge," filed with Thelma Mueller, Clerk of the Houston 14th Court of Civil Appeals on June 17, 1981, shows such references made by TI to be erroneous. The only statement, which was made by Mr. Alexander, one of TI's attorneys at trial, was on page 5 which states:

"MR. ALEXANDER: Let me interrupt right now, let's just eliminate those definitions except the one substantially performed, the other definitions, as I marked here, didn't add anything to the case and refer to issues that have been eliminated. . . ."

No objections to the submission of Special Issues 7 and 8 were in fact made. Given the most liberal construction, the remarks of Mr. Alexander could hardly be construed as an objection to the submission of said special issues. There being no objection made to the submission of Special Issues 7 and 8 TI's fourth point of error is overruled. However, since we purposefully pretermitted discussion of Special Issues 7 and 8, summarized above in our consideration of TI's second point of error, we now discuss such issues although the submission of the special issues, and findings made by the jury in response to the same, do not affect our decision in this appeal. These issues submit questions of law or, at best, mixed questions of law and fact without appropriate explanatory instructions to cure such submission. *Trinity Universal Insurance Co. v. Ponsford*, 423 S.W.2d 571 (Tex.1960); *Housing Authority of City of Dallas v. Hubbell*, 325 S.W.2d 880 (Tex.Civ.App.—Dallas 1959, writ ref'd n.r.e.). Consequently, the answers thereto can form no basis for judgment for either party. The status reports, which the proof shows were not made, were reports of breeding and the names of the sires of the calves of some fourteen female animals delivered to Allday at his ranch in Crockett, Texas. Fact issues could have been submitted to the jury regarding the alleged failure of TI to comply with Paragraph 12 of the agreement respecting such reports. The trial court should not have submitted the issues as framed, but since it did, the court should have disregarded the same. TI's fifth point alleged that the trial court erred in entering judgment on the answers to Special Issues 7 and 8. Since the judgment below was unfavorable to Allday, it is quite obvious that the trial court did not enter his judgment based on the jury findings on said special issues. The point of error is overruled.

■ Allday's fifth cross-point contends the trial court erred in excluding on TI's hearsay objection the report of Dr. Clayton (ranch veterinarian for Allday). TI makes no reply in its reply brief to the cross-point, but at trial TI objected on the grounds of hearsay and that the report contained conclusions of the veterinarian upon which reasonably competent veterinarians could differ. Allday's argument in support of this point is that the tender of such evidence was made properly under the Business Record's Act (Article 3737e, V.A.C.S.), and that the court erred in sustaining the objection of TI. We agree. We have examined the tendered report (defendant's exhibit 28) and the recording of the findings of Dr. Clayton following his examination of the cattle. Under the record here none of the findings made in such report were of the character about which competent veterinarians ordinarily would differ, e.g., pregnancy of a cow, and were not genuinely disputed at the trial. Determination of pregnancy of a heifer is demonstrated by objective signs through palpation which procedure is well known to all competent veterinarians and thus his findings made therein do not rest on conjectural or speculative expert opinion. *Loper v. Andrews*, 404 S.W.2d 300 (Tex. 1966). The recorded facts respecting the growth on the penis of the bull surely meets the criteria of the first general type illustrated in *Loper v. Andrews, supra*, at 305. Allday's fifth cross-point is sustained.

In accordance with Rule 434, Texas Rules of Civil Procedure, we must render the judgment that the trial court should have rendered in the case. We find that the evidence in the case was fully developed by

both TI and Allday in the two-week trial. Good and sufficient reason is not shown in the record for a re-trial on any of the disputed issues in the case requiring a remand of the case in the interest of justice. *Missouri Pacific Railroad Co. v. Whittenburg & Alston,* 424 S.W.2d 427 (Tex.1968).

That part of the take-nothing judgment rendered below against Edwin Allday on his counterclaim is reversed, and judgment is here rendered that Doris Fondren Allday, in her capacity as Independent Executrix of the Estate of Edwin Allday, deceased, do have and recover over and against Texas Imports, a partnership comprised of L.F. McCollum, James H. Chadwick and Ronald P. Cuenod, the sum of $122,500.00, together with interest thereon at the rate of six percent per annum from March 20, 1975, until the 24th day of March, 1983, all costs incurred in this court and in the trial court, as well as interest on said judgment sum and on all costs at the rate of nine percent per annum from March 24, 1983, until paid. That part of the take-nothing judgment rendered against Texas Imports is affirmed.

Reversed and rendered in part; affirmed in part.