John C. ARCHIBALD, III, Petitioner,

v.

ACT III ARABIANS, et al.,
Respondents.

No. C–7140.

Supreme Court of Texas.

July 6, 1988.

Rehearing Denied Sept. 14, 1988.

---

Kevin DuBose, Perdue, Turner & Berry, Houston, for petitioner.

Joe H. Reynolds, Houston and J. Bruce Bennett, Austin, Reynolds, Shannon, Miller, Blinn, White & Cook, for respondents.

SPEARS, Justice.

The issue in this case is whether there is an implied warranty of good and workmanlike performance that applies to horse training services. Petitioner John Archibald placed an Arabian mare in the training program offered by respondent Act III Arabians. While under the care of Act III Arabians, the mare was injured and eventually had to be destroyed. Archibald sued Act III Arabians, alleging negligence, gross negligence, and violations of the Texas Deceptive Trade Practices Act (DTPA). Tex.Bus. & Comm.Code Ann. § 17.41 et seq. (Vernon 1987). The jury answered all issues on the DTPA claim in Archibald's favor. The trial court, however, ruled that no implied warranties for services exist under Texas law, and rendered a take nothing judgment against Archibald. The court of appeals affirmed the judgment of the trial court. 741 S.W.2d 957. We reverse the judgment of the court of appeals and remand the cause to that court for a consideration of the points of error not previously reached.

Archibald placed four Arabian horses with Act III Arabians for training as show horses. One of the horses, a mare named Gayle Silva Robyn, was to be trained in an English pleasure riding style. The mare proved difficult to train, bucking each time she was commanded to trot. One of the trainers for Act III Arabians, in an attempt to break the mare's bucking habit, put the horse through a particularly strenuous training session. The trainer used the riding crop extensively, and welts developed on the mare's hindquarters. A veterinari-

an treated the mare for abrasions and swelling. Within a few days, the mare's skin became dry and sloughed off. The skin condition was beginning to improve when the mare developed founder, a disease that causes lameness as a result of impaired circulation of the blood to the hoof. The disease so incapacitated the mare that she had to be destroyed.

Archibald sued Act III Arabians for damages resulting from the mare's death. He alleged negligence, gross negligence, and violations of the DTPA. Archibald asserted that Act III Arabians had violated the DTPA by breaching the implied warranty that its horse training services would be performed in a competent, safe, and humane manner. The jury found that Act III Arabians was negligent but that its negligence was not the proximate cause of the mare's death. On the DTPA claim, the jury found that (1) Act III Arabians failed to train the mare in a good and workmanlike manner; (2) Act III Arabians' failure to perform in a good and workmanlike manner was a producing cause of the mare's death; and (3) the mare had a fair market value of $75,000. Nevertheless, the trial court rendered a take nothing judgment against Archibald on the basis that no implied warranties for services exist under Texas law. The court of appeals affirmed the judgment of the trial court.

The dispositive issue in this case is whether horse training services fall within the scope of the implied warranty enunciated in *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349 (Tex.1987). In that case, we recognized that an implied warranty of good and workmanlike performance applies to services involving the repair or modification of existing tangible goods or property. *Id.* at 354.

The warranty articulated in *Melody Home* extends, by its very terms, to a broad range of services. The term "existing tangible goods" refers generally to all moveable personal property other than money. *See* Tex.Bus. & Comm.Code Ann. § 2.105 (Vernon 1968); *Trunkline LNG Co. v. Trane Thermal Co.*, 722 S.W.2d 722, 724 (Tex.App.—Houston [14th Dist.] 1986,

writ ref'd n.r.e.). Similarly, the term "modification" broadly includes any change or alteration that "introduces new elements into the details [of the subject matter] or cancels some of them" but which leaves "the general purpose and effect of the subject matter intact." *Webb v. Finger Contract Supply Co.*, 447 S.W.2d 906, 908 (Tex.1969); Black's Law Dictionary 905 (5th ed. 1979).

A horse is an existing tangible good. *See* Tex.Bus. & Comm.Code Ann. § 2.105 (Vernon 1968); *Texas Imports v. Allday*, 649 S.W.2d 730, 738–39 (Tex.App.—Tyler 1983, writ ref'd n.r.e.). The trainer of a horse seeks to alter the demeanor and skills of the animal by instruction, discipline, and drill. Webster's Third New International Dictionary 2424 (1961). Training introduces new elements to enhance the horse's capabilities and personality and extinguishes undesirable traits. The result is a modification of the horse's intrinsic ability to perform and obey commands. Equally important, horse training modifies the value of the animal. Properly conducted training may substantially increase the worth of the animal; improper training may render the animal worthless. Horse training services, therefore, fall within the scope of the implied warranty of good and workmanlike performance recognized in *Melody Home* because horse training involves the modification of an existing tangible good.

The judgment of the court of appeals is reversed and the cause remanded to that court for a consideration of points of error not previously reached.

PHILLIPS, C.J., not sitting.

WALLACE, J., dissents, joined by CULVER, J.

GONZALEZ, J., dissents.

WALLACE, Justice, dissenting.

I respectfully dissent. I would define the dispositive issue before this court to be whether the factual situation in the current case falls within the ambit of the implied warranties enunciated in both *Humber v. Morton*, 426 S.W.2d 554 (Tex.1968) and *Melody Home Mfg. Co. v. Barnes*, 741 S.W. 2d 349, 352 (Tex.1987). I would hold that it does not.

In *Humber*, this court held that a builder/vendor impliedly warrants to a purchaser that a building constructed for residential use has been constructed in a good and workmanlike manner and is suitable for human habitation. *Melody Home*, 741 S.W.2d 349, 352. *Melody Home* expanded the *Humber* warranty to include an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner. *Id.* at 354. In *Melody Home*, purchasers of a mobile home brought suit against the manufacturer of their home alleging a breach of implied warranty that repairs would be performed in a good and workmanlike manner. Specifically, Melody Home failed to connect a sink to the drain in one of the interior walls. This failure resulted in a continual leak which damaged the home's flooring, sheetrock and insulation. Melody Home's workmen attempted to repair the leak, but succeeded only in causing additional damage. *Id.* at 351.

The *Melody Home* and *Humber* implied warranties are applicable only to construction for residential use and repair or modification of tangible goods or property. I would decline to extend the principles articulated in *Humber* and *Melody Home* to encompass an implied warranty for horse training services.

Every contract carries with it the common law duty to perform with care and skill; the negligent failure to meet this implied standard provides a basis for recovery in both tort and contract. *Coulson v. Lake L.B.J. Municipal Utility District*, 734 S.W.2d 649 (Tex.1987), *citing, Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508 (1947). As this court stated in *Coulson*, there is no discernible difference between a claim that efforts failed to be performed in a good and workmanlike manner and a claim that efforts were negligently performed. *Coulson*, 734 S.W.2d 649, 651.

Archibald had adequate legal grounds upon which to proceed against Act III. Causes of action for negligence and breach of contract were available to him. Archibald failed to obtain the requisite proximate cause finding on his negligence theory and additionally failed to plead a breach of contract cause of action. I do not find Archibald's failure to prevail under existing remedies to warrant the creation of a new implied warranty.

I would affirm the court of appeals.

CULVER, J., joins in this dissent.

GONZALEZ, Justice, dissenting.

I write separately because the majority opinion and the dissent fail to address the case relied upon by the court of appeals, *Dennis v. Allison*, 698 S.W.2d 94 (Tex. 1985). At a minimum, the court of appeals and the bar are due the courtesy of an explanation as to why this cause is not governed by *Dennis*. I believe that *Dennis* controls the outcome of this cause and, accordingly, I would affirm the judgment of the court of appeals.

Horse trainers provide professional services. The plaintiff (petitioner) pled that the defendants were professional horse trainers and throughout the trial continuously referred to the defendants as professional horse trainers. Petitioners have therefore judicially admitted that the defendants were providing "professional services." *Houston First American Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex.1983). Thus, the court of appeals was correct in framing the issue on appeal as "whether Texas law recognizes an implied warranty of good and workmanlike performance of personal services rendered by a professional." 741 S.W.2d at 958.

The nature of a professional's work is totally inconsistent with the idea that a professional gives an implied warranty guaranteeing an error-free performance. Unlike the manufacture, construction, repair or modification of tangible property, the rendition of professional services is neither mechanical nor routine. It requires the exercise of intellectual skill, judgment and discretion. This is certainly true in horse training.

It is undisputed that horses have different personalities and temperaments. Some are trainable and others are not. Training techniques have to be custom-made for each horse and must be modified by the horse trainer depending upon the response of the horse. The skills necessary to properly evaluate and enhance the talents and capabilities of a horse can only be rendered by a professional.

In *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex.1987), the court reserved for another time the question of "whether an implied warranty applies to services in which the essence of the transaction is the exercise of professional judgment by the service provider ..." In our present case, that issue is squarely presented. The court of appeals determined that no warranty existed in the present case, citing as authority our previous opinion in *Dennis*.

While I applaud the majority's decision to decline the invitation to overrule *Dennis*, I am chagrined by the way the majority resolves this case with no mention of *Dennis*. The majority simplistically reasons that because a horse is a tangible good, and because horse trainers sometimes succeed in modifying a horse's behavior resulting in an increase in the value of a horse, that the implied warranty of services which the court judicially created in *Melody Home* should apply to horse trainers. Not once does the majority opinion mention the word "professional" or "professional services." The court's failure to meet the issue before us head on, regrettably, raises more questions than it answers, and will require years of costly litigation to remedy. This "error" is compounded by the fact that as authority for its holding, the majority cites *Black's Law Dictionary*, *Webster's Third New International Dictionary* and one supreme court case dealing with a suit on a note and a guaranty agreement.

Like Justice Wallace, I view the implied warranty created in *Melody Home*, 741 S.W.2d at 354, to be only a limited extension of the implied warranty first recog-

nized in *Humber v. Morton*, 426 S.W.2d 554 (Tex.1968). In *Melody Home* I expressed both questions and concerns regarding the extent to which this new implied warranty might be applied in the future. *Melody Home*, 741 S.W.2d 349, 356 (Gonzalez, J. concurring). The court's present writing answers some of my questions, but does not relieve my concerns.

In *Melody Home* I speculated that negligence was still the standard by which to measure compliance with the new implied duty, although the court described it as a warranty and justified its creation with strict liability analysis. My guess was wrong. Apparently the burden of proof is more closely analogous to recovery in strict liability.

In the present case, the consumer was unable to prove that the negligence of Act III proximately caused him any damage. The consumer, however, did obtain favorable findings that Act III failed to train the horse in a good and workmanlike manner and that such failure was a producing cause of the horse's death. As Justice Wallace correctly observes, there is no discernible difference between a claim that efforts failed to be performed in a good and workmanlike manner and a claim that efforts were negligently performed, citing *Coulson v. Lake L.B.J. Municipal Utility District*, 734 S.W.2d 649, 651 (Tex.1987). There is, however, a difference in "producing cause" and "proximate cause." Producing cause means an efficient, exciting, or contributing cause which is a continuous and unbroken sequence in connection with any other cause or causes producing the event resulting in injury.[1] *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). Proof of proximate cause is more burdensome because it incorporates the added element of foreseeability. J. Sales and J. Perdue, *The Law of Strict Liability in Texas* at 30 (1977).[2]

I was therefore mistaken when I surmised that the court only intended to extend the benefits of the DTPA to consumers whose damages were proximately caused by the negligence of certain service providers. Instead, the court both increased the potential liability of the defendant service providers and lessened the burden of proof for the plaintiff. As I said in *Melody Home*, the service consumer already possesses a choice of remedies in both contract and tort. *Melody Home*, 741 S.W.2d 349, 358 (Gonzalez, J. concurring). Further, if an element of deception is present, recovery under the DTPA should also be available. I can, however, fathom no public policy justification for extending the penal provisions of the DTPA to a plaintiff who is simply dissatisfied with the service transaction. This is particularly so when a plaintiff's case is so weak that he cannot even sustain a recovery in negligence.

In *Dennis*, the professional service was pure in the sense that it was unrelated to the repair or modification of any tangible good. Arguably, the professional/non-professional distinction reserved in *Melody Home* is no longer significant. The court seems to be saying that regardless of the exercise of professional judgment, the warranty applies if the professional is engaged in modifying or repairing an existing or tangible good. I still think that the public policy reasons for imposition of this strict liability concept is lacking. Thus, none of the implied warranties recognized in Texas should apply to the rendition of professional services.

---

1. 3 State Bar of Texas, *Texas Pattern Jury Charges*, PJC 70.01 (1982) provides:
   PJC 70.01 Producing Cause
   "PRODUCING CAUSE" means an efficient, exciting or contributing cause, which, in a natural sequence, produced the occurrence. There can be more than one producing cause.

2. 1 State Bar of Texas, *Texas Pattern Jury Charges*, PJC 2.04 (2d ed. 1987) provides:
   PJC 2.04 Proximate Cause

"Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using *ordinary care* would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

For the reasons expressed here and in my concurring opinion in *Melody Home*, I dissent.