THOMAS C. COOK, INC., Appellant,

v.

Azizollah ROWHANIAN, Appellee.

No. 08–88–00169–CV.

Court of Appeals of Texas,
El Paso.

May 17, 1989.

Rehearing Denied June 28, 1989.

Thomas R. Beech, Law Offices of Thomas R. Beech, Houston, for appellant.

Dan L. Armstrong, El Paso, for appellee.

Before OSBORN, C.J., and FULLER and WOODARD, JJ.

## OPINION

OSBORN, Chief Justice.

This case involves traveler's checks which were purchased in Iran and lost in New York. The same parties were before this Court in *Thomas C. Cook, Inc. v. Rowhanian,* 700 S.W.2d 672 (Tex.App.—El Paso 1985, writ ref'd n.r.e.). We reverse and render in part and affirm in part and reform the judgment of the trial court so as to award recovery for the value of the checks which were lost and for prejudgment and post-judgment interest.

Mr. Rowhanian did not buy any of these checks from Thomas C. Cook, Inc., the issuing party, and the checks were not issued to him. He bought these traveler's checks on the open market, apparently at an elevated cost, as a means of taking more money out of Iran than was lawful. The facts giving rise to this suit are set forth in our prior opinion with one notable difference. At the first trial, Mr. Rowhanian testified that the checks which he purchased from street brokers had no signatures by the owners on them. At the second trial, he testified these checks had been signed and countersigned by the original purchasers. If the checks had the signature required at the time of purchase, then they were negotiable instruments. Tex. Bus. & Com.Code Ann. sec. 3.104, comment 4 (Vernon 1968). If the checks also had the owner's countersignature on them, they were bearer paper and negotiable by delivery alone.

After our remand for a new trial, Appellee amended his pleadings to allege an agreement to refund the value of the lost checks upon his signing an indemnity agreement and a breach of an implied warranty to perform a refund service and also a violation of the Texas Deceptive Trade Practices Act.

By its verdict, the jury found that: (1) Rowhanian had acquired ownership of the traveler's checks in question, (2) these checks were lost or stolen, (3) Cook agreed to pay the claim on the checks upon receipt of an indemnity agreement, (4) Cook breached that agreement, (5) such breach was the producing cause of damages to Rowhanian, (6) Cook breached an implied warranty to perform services in regard to the traveler's checks, (7) such breach was a producing cause of damages to Rowhanian, (8) Cook engaged in a deceptive act or practice concerning the traveler's checks, (9) such deceptive trade practice was a pro-

ducing cause of damages to Rowhanian, (10) Rowhanian sustained damages of $27,000.00, (11) Cook's acts were a producing cause of mental anguish to Rowhanian, (12) Rowhanian's damages for mental anguish was $10,000.00; and (13) total attorney's fees for trial and appeal are $25,300.00.

The trial court found the damages to be $37,000.00, which it trebled for the sum of $111,000.00, and attorney's fees of $25,300.00, plus prejudgment interest of $114,273.92, for a total judgment of $250,573.92.

## DECEPTIVE TRADE PRACTICES

First, we must consider whether the Appellee may recover under the Texas Deceptive Trade Practices Act. The Appellant contends Appellee is not a "consumer" and that traveler's checks do not involve a "service" within the meaning of the Act.

The DTPA allows a "consumer" injured by deceptive trade practices to bring a private cause of action for multiple damages or injunctive relief. Tex.Bus. & Com.Code Ann. sec. 17.50(a)(Vernon 1987). See 27 P. Kens and S. Cochran, *Texas Practice Consumer Rights and Remedies*, secs. 1–58 (1983). A "consumer" is "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services,...." Section 17.45(4). "Services" means "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." Section 17.45(2).

The Texas Supreme Court has further refined the definition of "services" as:

'[A]ction or use that furthers some end or purpose: conduct or performance that assists or benefits someone or something: deeds useful or instrumental toward some object.' This definition described 'services' in terms of 'action,' 'conduct,' 'performance' and 'deeds.' All of these synonyms demonstrate that services includes *an activity* on behalf of one party by another. This characterization indicates that 'services' is similar in nature to work or labor.

*Riverside National Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex.1980) quoting *Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex.1962).

The Court has held that an attempt to acquire money is not an attempt to acquire either work or labor as contemplated by the DTPA. *Riverside*, 603 S.W.2d at 174. Thus, borrowing money is not an acquisition of services under the DTPA. *Riverside*, 603 S.W.2d at 174. Neither is the purchase of a certificate of deposit, which merely seeks money to be paid in the future. *First State Bank v. Chesshir*, 634 S.W.2d 742, 747 (Tex.App.—Amarillo 1982, writ ref'd n.r.e.). However, where the purchaser acquires services *collateral* to the certificate of deposit from the bank, he is a consumer under the DTPA. *First Federal Savings & Loan Association of San Antonio v. Ritenour*, 704 S.W.2d 895, 900 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.) (where bank provided financial advise and counseling to its CD purchasers). Similarly, where a lending institution provides services collateral to the loans themselves, the DTPA becomes applicable. *Juarez v. Bank of Austin*, 659 S.W.2d 139, 142 (Tex. App.—Austin 1983, writ ref'd n.r.e.) (where borrower was provided credit insurance in addition to loans); *Fortner v. Fannin Bank in Windom*, 634 S.W.2d 74, 76 (Tex. App.—Austin 1982, no writ) (where bank agreed to file title papers on loan customer's car as collateral service to loan).

A traveler's check is an instrument for payment that combines the marketability of cash with the safety of a bank draft. See *Xanthopoulos v. Thomas Cook, Inc.*, 629 F.Supp. 164, 170 (S.D.N.Y.1985); *Citicorp v. Interbank Card Association*, 478 F.Supp. 756, 759 (S.D.N.Y.1979); *Emerson v. American Exp. Co.*, 90 A.2d 236, 240 (D.C.Mun.1952). The issuer, here Appellant Cook, prints the check, customarily in one of several standard denominations, and offers it for sale. The purchaser buys the instrument and signs it in the presence of the issuer or its agent. Sometimes the purchaser must pay a commission and sometimes not. In either case, there is consideration for the transaction running to the issuer as it gets the use of the purchaser's cash while waiting for the ulti-

mate recipient of the check to redeem it with the issuer. The nature of the agreement between the issuer and the purchaser is that the issuer will replace the check if it is lost or stolen, thus providing a safety net to the purchaser that is unavailable with cash. To use the check, the purchaser need only countersign it in the presence of the person to whom he is tendering it, (referred to as "the acceptor" by Court in *Xanthopoulos*). This offers some protection against the thief who would find it difficult to forge the purchaser's signature while under observation. The "acceptor" then redeems the check with the issuer and receives cash equaling the face value of the check.

The Uniform Commercial Code governs traveler's checks—a type of commercial paper—and their use. A traveler's check containing the purchaser's first "identifying" signature is a negotiable instrument. *See* Tex.Bus. & Com.Code Ann. sec. 3.104, comment 4 (Vernon 1968); *Xanthopoulos*, 629 F.Supp. at 171. The purchaser's countersignature converts the check to bearer paper, negotiable by delivery alone. *Emerson v. American Exp. Co.*, 90 A.2d 236, 240 (D.C.Mun.1952); *Xanthopoulos*, 629 F.Supp. at 172. The issuer will thus honor a traveler's check when the signature and countersignature match:

> [T]he very nature of a travelers check is such that, having been signed and countersigned by the purchaser, it may be regarded as having been endorsed in blank and rendered subject to negotiation by delivery; and ... a party cashing such a check containing identical signature and countersignature is entitled to collect from the issuer.

*Emerson*, 90 A.2d at 241. *See also Peoples Sav. Bank of Grand Haven, Mich. v. American Surety Co. of New York*, 15 F.Supp. 911, 913 (W.D.Mich., S.D.1936).

To obtain a replacement for a lost or stolen check, the purchaser must first file a police report, a measure designed to ensure the good faith nature of the claim. Secondly, the claimant must prove that he purchased the lost or stolen check; this is usually done by producing a "sales advice."

A "sales advice" is a form of receipt given to the customer at the time of purchase; it provides him with a record of the serial number and denomination of each check purchased and also provides instructions on what to do should the check be lost or stolen. Finally, the claimant must attest to the fact that he signed the check once, that is, at the time of purchase, in a report of loss.

■ We conclude that the purchaser of a traveler's check acquires "services" within the meaning of the DTPA. Appellant guarantees payment to the person to whom the purchaser tenders the check (the "acceptor"), provided the check is properly signed and countersigned. *Compare La Sara Grain Company v. First National Bank of Mercedes*, 673 S.W.2d 558, 564 (Tex.1984) (services which a bank provides in connection with a checking account fall within the DTPA). The most important and valuable service provided to the purchaser of a traveler's check—the "service" upon which Appellee's DTPA action is based—is the issuer's guarantee to replace a lost or stolen check. This service extends to the original purchaser of the traveler's check, provided that a basic requirement is first met. Appellant's "sales advice" explains this requirement in the following language:

> **IMPORTANT**—Each cheque must be signed on receipt in the space marked 'Signature of Holder' at the bottom of the Cheque, and countersigned only in the presence of the paying Agent at the time of encashment. **Any loss arising from the non-observance of this precaution will fall on the holder.**

The reason for this requirement has already been noted. The thief or finder of a traveler's check which contains only one signature must forge the countersignature. The issuer, of course, may refuse payment on such a check. *See Xanthopoulos*, 629 F.Supp. at 172–73. *See also Sullivan v. Knauth*, 161 A.D. 148, 146 N.Y.S. 583, 586 (1914), aff'd 220 N.Y. 216, 115 N.E. 460 (1917) (issuer who paid traveler's checks on forged countersignature held liable to refund original purchaser). *Compare* Tex.

Bus. & Com.Code Ann. secs. 3.202, 3.404, 3.507, 4.401 (Vernon 1968) (provisions regarding unauthorized signatures). Thus, the issuer, under no threat of multiple liability, agrees to refund a lost check under these circumstances. When the purchaser disregards this requirement and countersigns the check prior to theft or loss, however, no forgery is necessary; the genuine countersignature is already there and the person seeking to redeem the check is entitled to collect.

It is therefore unreasonable to require replacement in this instance. A traveler's check countersigned out of the acceptor's presence "creates a risk [of multiple liability] for which the issuer has not bargained." *See Xanthopoulos*, 629 F.Supp. at 174.

■ In the instant cause, we must next determine whether Appellee has standing under the DTPA as a "consumer" who "acquired by purchase" the refund service offered by Appellant. It is clear that a "consumer" is defined, not in terms of a person's relationship to the party he is suing, but only in terms of his relationship to a transaction in goods or services. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex.1981); *Birchfield v. Texarkana Memorial Hospital*, 747 S.W.2d 361, 368 (Tex.1987); *Flenniken v. Longview Bank and Trust Company*, 661 S.W.2d 705, 707 (Tex.1983). Applying this definition to the "transaction" of this cause, that is, to the purchase of traveler's checks, it is apparent that the original purchaser thereof is a "consumer" with regard to the refund "service" *when he complies with the requirement of countersignature in the acceptor's presence.* Compliance with this requirement provides the impetus for the refund service and the "sales advice" provided to the purchaser makes this requirement very clear.

■ Appellee in this cause testified that the checks he acquired and later lost were already signed and countersigned by the original purchasers. Had the original purchasers lost the checks in this countersigned form, they would not be entitled to a refund. Appellee, a subsequent holder of the checks as a result of the negotiation process instituted by the original purchasers, should not occupy a more favorable position. Appellee has no standing as a "consumer" within the meaning of the DTPA.

■ Appellee is precluded from recovery under the DTPA for an additional reason. Appellant correctly argues that Appellee must also establish that he was damaged by a false, misleading or deceptive act or practice and he has failed to do so. *See Qantel Business Systems, Inc. v. Custom Controls Company*, 761 S.W.2d 302, 305 (1988); *Home Savings Association v. Guerra*, 733 S.W.2d 134, 136 (Tex.1987); *DeWitt v. Prudential Insurance Company of America*, 717 S.W.2d 414, 418 (Tex.App.—Houston [14th Dist.] 1986, no writ). Appellee contends that the "sales advice" document prepared by Appellant falsely represents that any person who purchases traveler's checks and retains the companion "sales advice" is entitled to a refund if the checks are lost or stolen. The "sales advice" makes no such misrepresentation; it provides, in essence, that the traveler's check must be signed on receipt and "countersigned only in the presence of the paying Agent at the time of encashment." The failure to observe this precaution clearly results in the forfeiture of the refund service: *"Any loss arising from the nonobservance of this precaution will fall on the holder."* Appellant has thus accurately represented that a holder of a signed/countersigned traveler's check will sustain the loss if the check is lost or stolen.

Appellee also contends that, on a previous trip to the United States, he purchased Appellant's traveler's checks and was told at that time, apparently by Appellant's agents, "that if ... any of these things [checks] got lost they would take care of these yellow sheets [sales advices]; and we would refund you your money". This testimony merely indicates that Appellant accurately represented to Appellee, as original purchaser of Cook's traveler's checks, that he would be entitled to a refund upon loss. There is no evidence, however, of any ex-

press representation by Appellant that Appellee, as a subsequent purchaser of a check already signed and countersigned, would be entitled to a refund upon loss merely by producing the "sales advices" issued concurrently with the lost checks.

Appellee also contends that Appellant advertised that it would give a refund on just one phone call and that this representation was false. The advertisement in question does not appear in the record, although it was apparently admitted into evidence. Appellant objected to the admission of this advertisement, which appeared in a 1982 Texas periodical, as having no relevancy to Appellee's purchase of traveler's checks in Iran in 1979. There was no evidence to show that a similar advertisement was utilized by Appellant in Iran in 1979, nor did Appellee testify that he had seen such an advertisement in the U.S. or elsewhere.

We conclude that, even if Appellant's advertisement does constitute a misrepresentation, there is no evidence that it was a "producing cause" of any damages to Appellee. See C. Watson, *Causation Under the Deceptive Trade Practices Act* (Second Annual El Paso DTPA—Consumer Law Institute, February 17, 1989). Appellee produced no evidence from which the jury could have reasonably inferred that the damages sought by Appellee, with regard to Appellant's refusal to refund lost checks purchased by Appellee in Iran in 1979, were the result of Appellant's allegedly deceptive 1982 advertisement long after the checks were lost. See *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex.1985); *Riojas v. Lone Star Gas Co., a Division of Ensearch Corp.*, 637 S.W.2d 956, 959 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.). See also *MacDonald v. Texaco, Inc.*, 713 S.W.2d 203, 205 (Tex.App.—Corpus Christi 1986, no writ).

Appellee has no standing as a "consumer" under the DTPA. Furthermore, Appellee presented no evidence to show that Appellant committed a deceptive act which was the producing cause of Appellee's damages. We sustain Point of Error No. Three.

## IMPLIED WARRANTY

■ Appellant complains in Point of Error No. Six, that there was no evidence to support the jury's finding that Appellant breached an implied warranty to perform its refund service in a good and workmanlike manner. Appellee asserts that the Texas Supreme Court recognized the existence of such an implied warranty for all service transactions in *Melody Home Manufacturing Company v. Barnes*, 741 S.W.2d 349 (Tex.1987). This conclusion is questionable. *Melody Home* clearly recognized an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner. *Id.* at 354. But the court's holding left open the question of whether the warranty applies to services other than the repair or modification of existing goods. See R. Alderman and M. Rosenthal, *A Consumer Update: Recent Developments Under the Texas Deceptive Trade Practices Act*, 20 St. Mary's L.J. 495, 510–12 (1989). There is some indication that the court may be slow to expand this warranty. In *Archibald v. Act III Arabians*, 755 S.W.2d 84 (Tex. 1988), the court was asked to extend the warranty to professional services but the court chose to continue the limited scope of the warranty established by *Melody Home*, 755 S.W.2d 84, 86 (Tex.1988). See also R. Alderman and M. Rosenthal, 20 St. Mary's L.J. at 512.

Even if we presume such an implied warranty does exist, Appellee does not qualify as a recipient of this warranty. Only those purchasers of traveler's checks who have complied with the countersignature precaution central to the refund service are eligible to claim the protection of an implied warranty by the issuer to refund lost checks in a good and workmanlike manner. By his own testimony, Appellee established that he purchased these checks on the open market with countersignatures affixed. There is no evidence of compliance with the sales advice that the checks be countersigned only in the presence of the paying agent at the time of encashment. Point of Error No. Six is sustained.

The only argument raised by Appellant's brief with regard to the alleged indemnity agreement appears under Points of Error Nos. Five and Eight. Appellant argues that Appellee's breach of contract action—which is based upon Appellant's breach of its promise to refund the checks once Appellee and his son signed an agreement indemnifying Appellant against further loss—was improperly brought because a necessary party, the son John Rowhanian, was not joined in this action. The only authority offered by Appellant to support its contention is the case of *Texas Industries, Inc. v. Lucas*, in which the court held that "[a] party is barred from seeking contribution and indemnity from a party against whom the injured party has no cause of action." 634 S.W.2d 748, 757 (Tex.App.—Houston [14th Dist.] 1982), *rev'd on other grounds*, 696 S.W.2d 372 (Tex.1985). That holding is not relevant to the issues in this case.

Point of Error No. Five states that "there is no evidence or insufficient evidence to support the jury's finding in response to Special Issue No. 3 that there was an indemnity agreement between Thomas Cook, Inc. and John Rowhanian, the son of Appellee." Appellant has misstated the jury's finding; in Question No. Three, the jury found that Appellant "agreed to pay Mr. Rowhanian's claim on the traveler's cheques in question upon receipt of an indemnity agreement from Mr. Rowhanian or his son John Rowhanian?"

■ No motion for new trial appears in the transcript, so Appellant has waived its factual sufficiency complaint. Tex.R.Civ.P. 324(b)(2). Turning to Appellant's no evidence point, it appears that there is more than a "scintilla" of evidence to support the jury's finding in Question No. Three. *See Martinez v. Delta Brands, Inc.*, 515 S.W.2d 263 (Tex.1974), for the standard of review for a no evidence challenge. Over Appellant's hearsay objection, Appellee offered into evidence a letter from Appellant to John Rowhanian which stated:

We refer to your father's recent loss of Thomas Cook Travelers Cheques....

Prior to our being able to effect refund to your father, we would appreciate if you could kindly have the enclosed Bond of Indemnity completed acting as a co-guarantor should we find at a later date that there is a discrepancy in the information furnished to us by your father.

. . . . .

In addition, Appellant wrote Appellee's attorney that:

[W]e are now in a position to consider Mr. Rowhanian's request for refund.

Since these cheques were countersigned we do require the enclosed Bond of Indemnity to be completed by the client. We do require a co-guarantor as well to sign this document. A review of the file indicates that the client's son would be an ideal choice.

. . . . .

As soon as this Bond is returned to us, we will be pleased to take further action on this claim.

. . . . .

Certainly, Appellant would not have requested an indemnity agreement on a form it provided if it did not intend to pay the claim upon completion of the bond of indemnity.

It should be noted that these exhibits constitute admissible, nonhearsay evidence since they contain Appellant's implied contractual promise to Appellee to refund the checks upon receipt of the indemnity agreement. Statements that constitute offer, acceptance or terms of a contract—so-called "operative facts"—are not hearsay; the making of such statements are in themselves relevant and thus evidence that such statements were made is not barred by the hearsay rule. *See Cherokee Water Company v. Forderhause*, 727 S.W.2d 605, 614 (Tex.App.—Texarkana), *rev'd on other grounds*, 741 S.W.2d 377 (Tex.1987); *Irving Lumber Company v. Alltex Mortgage Company*, 446 S.W.2d 64, 71 (Tex.Civ.App.—Dallas 1969), *aff'd*, 468 S.W.2d 341 (Tex. 1971). *See also* 33 Goode, Wellborn & Sharlot, *Texas Practice*, sec. 801.2 (1988). Appellant's Points of Error Nos. Five and Eight are overruled.

## DAMAGES

■ Appellant complains that the jury's award of $27,000.00 in actual damages was inflated and that no matter how much Plaintiff allegedly paid for the checks in question all that he could have ever intended or expected to receive from Appellant was $20,100.00, i.e., the face value of the checks. Appellant's point is well taken. An award of damages for breach of contract is supposed to place the injured party as nearly as possible in the position that he would have occupied had the defaulting party performed the contract. *Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484, 486 (1952); *LaChance v. Hollenbeck*, 695 S.W.2d 618, 621–22 (Tex.App.—Austin 1985, writ ref'd n.r.e.); *Community Development Service, Inc. v. Replacement Parts Manufacturing, Inc.*, 679 S.W.2d 721, 725 (Tex.App.—Houston [1st Dist.] 1984, no writ).

■ Had Appellant in this case performed under its contract with Appellee and refunded the lost checks upon receipt of the indemnity agreement, Appellee would have received only the face value of the lost checks, i.e., $20,100.00. *Compare Allied Building Credits, Inc. v. Grogan Builders Supply Co.*, 365 S.W.2d 692, 696 (Tex.Civ.App.—Houston 1963, writ ref'd n.r.e.) (measure of damages for breach of contract to deliver notes held to be their face value). That Appellee paid twice the face value for the traveler's checks on the black market is simply of no consequence in determining the damages for which Appellant is liable. There is no evidence to show that both parties contemplated that Appellee should recover the street vendor's profits as damages. Nor has it been shown that the mental anguish Appellee allegedly sustained was such a natural result of Appellant's breach of contract as to have been within the latter's contemplation when the contract was made. *See Dean v. Dean*, 821 F.2d 279, 281–82 (5th Cir.1987); *Rogowicz v. Taylor and Gray, Inc.*, 498 S.W.2d 352, 356 (Tex.Civ.App.—Tyler 1973, writ ref'd n.r.e.).

We have considered all of the Appellant's Points of Error, and we find no reversible error other than as previously set forth. All Points of Error except Nos. Three and Six are overruled. We reform the judgment of the trial court to award the Appellee the sum of $20,100.00, plus prejudgment interest at the rate of six percent per annum in accordance with Tex.Rev.Civ. Stat.Ann. art. 5069–1.03 (Vernon 1987). *See Missouri–Kansas–Texas Railroad Company v. Fiberglass Insulators*, 707 S.W.2d 943 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

Having recovered under a contract theory, we conclude the face amount of the checks were payable on or about September 1, 1981, the indemnity bond having been forwarded to Cook on August 28, 1981. Suit was filed on September 9, 1982, but upon the wrong theory, and we suspend the period interest to be calculated from the filing of suit until our first mandate issued on January 12, 1987. Thus, prejudgment interest is due for 26.3 months, being from October 1, 1981 to September 9, 1982 and from January 12, 1987 to April 15, 1988 when judgment was entered, for a sum of $2,643.15.

Azizollah Rowhanian shall have and recover from Thomas C. Cook, Inc., the sum of $22,743.15, plus interest thereon at the rate of ten percent per annum, compounded annually, from April 15, 1988.

## OPINION ON MOTION FOR REHEARING

By motion for rehearing, Appellant asserts this Court has departed from a liberal construction of the DTPA. He argues our "Opinion tracks the normal business practices of traveler's checks during normal times to reach the conclusion that this particular Plaintiff was not a consumer ...." That is a correct analysis. We find nothing in the sales advice and have been cited to no case law that says a court should reach a different result when a purchaser buys traveler's checks on the black market and conceals them from local authorities in order to smuggle additional funds out of his own country. We are not prepared to make some special exception under those circumstances to reach a more liberal interpretation in this case.

It is suggested we erred in holding that the "refund service" does not come into play until the check is countersigned by the original purchaser. We reached that result only because that is the device which protects both the issuer and the purchaser of the check. If a purchaser loses checks which have no signature, one who finds them can sign in both places on the checks. If the signatures match, an acceptor or paying agent would have no reason to suspect a forgery. If the checks, as in this case, were signed and countersigned at the time of purchase, they became bearer instruments and subject to negotiation by delivery to a paying agent who would have no reason to suspect a forgery. In either case, the issuer should not bear the loss because the original purchaser has not countersigned the check in the presence of the acceptor or paying agent. Certainly, the sales advice makes those requirements abundantly clear and states that any loss arising from non-observance of this requirement will fall on the holder. When Appellee purchased checks which had both signature and a countersignature and received the sales advice for those checks, he was charged with knowledge that any loss would fall on him as holder.

The motion for rehearing is overruled.